INTERNATIONAL HARVESTER COMPANY OF AMERICA, Appellee,
v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COM-
PANY, Appellant.

**EVIDENCE:** Trial—Instructions—Concession by Requested Instruc-
tion. In an action for damages to goods destroyed by fire, a
requested instruction that value is not to be determined from
selling price if the price has been arbitrarily fixed by the seller,
and that market value is a criterion of real value only if the
article is sold in an open, competitive market, is not a con-
cession that the test of damages is the market value if market
has been shown; and the offer did not negative the claim that
replacement of the goods destroyed was the correct measure of
damages.

**TRIAL:** Reception of Evidence—Objections—Measure of Damages
2 Cost of Replacement. In an action for damages to farm machinery destroyed by fire, objection to evidence held to raise the question whether the measure of damages was the cost of replacement of the goods destroyed.

**TRIAL:** Reception of Evidence—Objection as Incompetent, Irrelevant, and Immaterial—When Sufficient. If the grounds of objections to testimony are perfectly obvious, and the evidence is wholly inadmissible for any purpose, the general objection of incompetent, immaterial, and irrelevant is sufficient, and such objections are sufficient in the following cases: As being incompetent, when it is incompetent for any purpose, and could not have been made competent, and as being immaterial when it is immaterial, and as being irrelevant when the irrelevancy appears from the evidence itself, and as being incompetent and immaterial where the grounds of objections are discernible.

**DAMAGES:** Measure—Fair Compensation to Loser, with Least Burden to One Causing Loss. The basis of all rules as to damages is a fair compensation to the loser, with the least burden to the one who caused the loss, the injured party not being permitted to receive more than he has lost.

**DAMAGES:** Measure—Stock of Goods Destroyed by Fire—Not Market Price. The owner's measure of damages for a stock of farm machinery destroyed by fire was not the market value of goods at place destroyed, because the owner would, if permitted to sell as intended, net from the sale of the same less than the market price, after paying various expenses of the sale, including insurance, storage, discounts, commissions, and loss by depreciation, there being common knowledge, presumption, and judicial notice as to some of such matters; but such measure was the reasonable cost of replacement, and anything lost by necessary delay.

**TRIAL:** Instructions—Requested Instructions—Curing Error in Admission of Evidence. It was error to refuse to give an instruction that would have cured error in admission of evidence based on erroneous measure of damages.

**DAMAGES:** Market Value. Market value is the only criterion of real value as to an article which is sold in an open, competitive market.

**DAMAGES:** Market Value—Price List. *Held* that a list of goods introduced in evidence, with value placed thereon by the plaintiff, did not show the actual value of goods, and was nothing

more nor less than the plaintiff's arbitrary selling price; and the fact that he had competition in the sale of his goods did not make it any the less so.

RAILROADS: Fires—Evidence—Sparks and Cinders 17 Days Before. In an action for goods destroyed by fire, evidence that a locomotive which was alleged to have caused fire had emitted sparks and cinders 17 days before the fire, was competent, being evidence of the defective condition of the locomotive, which would be presumed to have continued to exist.

RAILROADS: Fires—Spark Arresters—Emission of Sparks—Evidence—Competency. In an action for goods destroyed by fire, evidence that a locomotive which was alleged to have caused the fire emitted sparks and cinders was not rendered inadmissible by the fact that the engine was equipped with spark arresters and appliances, particularly in view of other evidence that it was not equipped with the best spark arresters in general use.

APPEAL AND ERROR: Reception of Evidence—Order of Introduction—Discretion—Harmless Error. Where testimony introduced in rebuttal should, in strictness, have been introduced in chief, the Supreme Court will not reverse by reason thereof, in the absence of a strong showing of abuse of discretion and of prejudice; and where there was no application made below for leave to meet the testimony, it will be presumed to be harmless error.

RAILROADS: Fires—Other Fires—Evidence. In action for injuries by fire from locomotive, evidence of other fires prior to the day of the fire in issue is inadmissible.

DAMAGES: Torts—Anticipated Damages. One guilty of a tort may be held to respond for failure to prevent harm which might in reason be anticipated.

RAILROADS: Fires—Other Fires—As Showing Notice of Inflammable Materials on Right of Way—Notice to ''Chief Clerk'' Insufficient. In an action for injuries by fire from locomotive, evidence as to other prior fires was inadmissible to prove notice to the railway of inflammable materials on right of way, by reason of complaint made to the "chief clerk," there being no showing as to the extent of such clerk's authority.

EVIDENCE: Admissibility—Hearsay. Evidence by witness as to value of salvage of goods destroyed by fire, as to what sums paid therefor appeared in reports received by him from the factory to which they had been shipped, and in relation to which he

made no claim of personal knowledge, was incompetent and hearsay.

**APPEAL AND ERROR: Misconduct of Counsel—Not Reviewed Where Reversal on Other Grounds.** Where there must be a reversal on other grounds, the question of alleged misconduct of counsel in argument to the jury will not be reviewed, as the same would be a moot question.

*Appeal from Cerro Gordo District Court.*—C. H. KELLEY, Judge.

## MAY 14, 1919.

THE plaintiff claims that defendant negligently set fire to certain stocks of farming implements kept by the plaintiff in its warehouse at Mason City. There was verdict and judgment thereon for plaintiff, and defendant appeals.— *Reversed and remanded.*

*Cook, Hughes & Sutherland,* and *Blythe, Markley, Rule & Smith,* for appellant.

*Cliggitt & Smith, F. M. Lowes,* and *Arthur Mullen,* for appellee.

SALINGER, J.—I. The appellant asserts the court erred in permitting plaintiff to introduce in evidence, as the basis for allowance of damages, the prices at which it supplied dealers with goods such as are alleged to have been destroyed by the negligence of defendant; that it erred in this respect because the prices put in evidence by the use of Exhibit F were arbitrarily fixed by plaintiff itself, and were not the cost at which the goods could be replaced by plaintiff from factories at which the destroyed goods had been purchased; that it erred in refusing to strike Exhibit F because same was made up from an arbitrary value put upon the destroyed property by the plaintiff himself, and, therefore, does not show a value determined from a market in which there is competition.

The destroyed articles were farm machinery and binding twine; they were held in storage at Mason City for distribution and sale in 13 counties. Appellant presents that time labor, and expense were required to sell these goods; that it was probable there would be loss by delay and by failure to sell some of the goods, and a loss of interest on the amount invested. It contends that, therefore, the true measure of damages was what it would have cost to replace these goods, and that they could readily have been replaced; and that it was error to let the jury proceed as if said goods, though not delivered, had all been sold at the price fixed by the seller, net, and nothing was left except to collect the price, or as if such price, net, had been paid in cash, and the fire had destroyed that cash. It contends further that the prices permitted to go to the jury were no evidence of market value, because it appears that such prices were those that plaintiff had directed its servants and agents to sell at, and that these articles were not for sale, and were not and could not be sold on the market at Mason City, to which market the testimony as to market value was directed. Related is its claim that it was error to refuse Instruction 26, which declares that value is not to be determined from selling price if the price has been arbitrarily fixed by the seller, and that market value is a criterion of real value only if the article is sold in an open, competitive market. Appellee contends this

1. EVIDENCE: trial: instructions: concession by requested instruction. offered instruction is a concession that "market value is the test if market has been shown," and that, if the seller has not arbitrarily fixed the price, "this value may be established by plaintiff's selling price;" that the offer negatives all claim that replacement is the correct measure of damages. We do not so view it. Appellee adds that the same concession was worked by the offered instructions as a whole. One of these, No. 26, we have just dealt with.

There were 27 instructions offered. In addition to Instruction No. 26, Nos. 24, 25, and 27 make some reference to damages. All the others do not touch that subject. Now, appellant does not contend that replacement is generally the true measure, but that it is where goods are totally destroyed. Instruction 24 deals with nothing except goods only partially destroyed, and merely declares that the measure of recovery as to them is "the value of the property destroyed." Neither Instruction 25 nor 27 deals with property that was totally destroyed. And neither can be strained into presenting a theory which excludes the cost of replacement as the compensation for property totally destroyed. Appellee insists further that no complaint was made by objection which adequately indicated that appellant contended replacement was the true measure. Appellant opposes that it may not fairly be said it is bound by any theory of trial proceeding on the line that replacement is not the adequate and proper compensation, and that its objections fairly advised the trial court that such compensation was insisted upon as the only one due, and that the measure of damages adopted was an incorrect one.

Grant the claim of appellee, and, of course, the cases control that hold a complaint may not first be made here. It becomes necessary, then, to investigate what objections were made.

II. This occurred in the examination of Johnsrud:

"Q. Do you know the fair market price in Mason City of the class and kind of machinery that this company was wholesaling here at that time,—furnishing your dealers at that time? Court: You are asking now as to the wholesale price? Counsel for plaintiff: Yes, sir."

2. TRIAL: reception of evidence: objections: measure of damages cost of replacement.

Thereupon, defendant objected "that the cost of machinery is not the price to the dealer;" and despite it, the witness was per-

mitted to answer that he did know such value.

"Q. Have you made a notation on Exhibit F as to the fair market value of all these lines of machinery here in Mason City on the 7th of October, 1910?" The witness answered, "Yes," over objection "that the cost of machinery is not the price to the dealers, and is not the proper measure of damages, and for the further reason that it does not appear as yet from the evidence whether plaintiff is a manufacturer or a jobber of this machinery." "Q. Well, what is the fair market value of the classes of machinery that you enumerated that was destroyed down there at that time?" To this, defendant made objection, among others, on the ground "that the proper measure of damages is not the market price." When, later, the witness was asked to say what the fair market value "of this line of stuff" was, in Mason City, on October 7, 1910, defendant asked leave to interrogate the witness as to his competency, and, this being denied, made objection that it was not shown the witness was qualified to testify to such market price. At this point, the court stated it understood that the reference to "fair market value" was to "the wholesale price of the goods in this locality." Counsel for plaintiff responded:

"We refer to the value in this sense when there is some man offering to sell to somebody willing to buy. It is not the retail value we are asking about: it is the fair value of implements like the implements that were in the warehouse—not at retail."

Further discussion ensued. In the course of it, Mr. Markley, one counsel for defendant, stated that the courts held "that the reasonableness of prices must depend upon the cost of production, the cost of material used, the risks of the business, the labor of producing, the demand for the goods, and all things which tend to show the reasonable worth of the article;" that, if it should develop, on cross-examination, that competition was throttled, as to goods

like the ones burned, then "the prices at which they sold
here and elsewhere would not be an ingredient or element
of market value," and it "would go back to the question
what the goods were really worth;" and there is no dis-
tinction "between price and value,—market value is never
admissible except to show the real value."

The witness was asked to state the fair market value in
Mason City of one item in the stock of goods burned, on
the day of the fire. Defendant objected that the question
"does not call for the proper measure of damages or value."
Like objection was interposed when witness was asked to
state the fair market value in the market at Mason City, on
the day of the fire, of the binding twine burned.

The conception of appellee is that the testimony re-
ceived against objection stated "the market value at which
the goods were selling in Mason City in the ordinary course
of trade." It seems to us the objections fairly advised court
and counsel: (1) That defendant was insisting that such
was not the proper measure of damages; (2) that, as to
such a stock as this, when destroyed as a whole, the com-
pensation due was not the "market value" in the market of
Mason City, nor the price to dealers; (3) that "reasonable
price" for such a stock depended upon cost of production
and of labor in producing, cost of material, demand for the
goods, and the "risks of the business." We think that the
objections made fairly indicated that cost of replacement
is the only true measure of damages in a case such as this,
—indicated that, therefore, the measure adopted by the court
was an erroneous one. The argument of appellee assumes
that the only objection made was that the proposed testi-
mony "would not tend to prove the proper measure of dam-
ages;" asserts that such an objection is not more specific
than "incompetent, immaterial, and irrelevant," and that
the last-named objection is never sufficiently definite. Some
aid and comfort is given this position in *Graves v. Bonness*,

97 Minn. 278 (107 N. W. 163, 164, 165). That case declares, in effect, that the trial court is not presumed to know any law, and adds that counsel "are supposed to know the law of their case. * * * Neither can we allow them to strike between wind and water on the trial and then go home to their books and study out other objections, and then urge them here." It should be noted that this very broad language is largely, if not wholly *obiter*, because the objection was, "It is incompetent, irrelevant, and immaterial, and no foundation laid." It was hardly necessary to holding such an objection insufficient, to say what was said. Passing that, we have to say: First, that such a rule would demand that objections should be made by an argument supported by a brief—a practice utterly impracticable and undesirable; second, that the objections made here were more definite than an assertion that the questions called for not more than testimony tending to prove the proper measure of damages; third, that they amounted to more than "incompetent, immaterial, and irrelevant;" and fourth, that while, in many instances, the last stated objection is too indefinite, there are many in which it is sufficiently specific.

*marginal note: 3. TRIAL: reception of evidence: objection as incompetent, irrelevant, and immaterial.*

"The value and sufficiency of the general and all inclusive objection, 'incompetent, immaterial, and irrelevant,' depends largely upon the nature of the evidence against which it is urged. * * * Thus, if the grounds of objection are perfectly obvious, and the evidence is wholly inadmissible for any purpose, the general objection is sufficient." 9 Encyc. of Evidence 71, 73.

And see *Sparf v. United States,* 156 U. S. 51; *First Nat. Bank v. Carson,* 30 Neb. 104 (46 N. W. 276); *Swan v. Thompson,* 124 Cal. 193 (56 Pac. 878); *Roche v. Llewellyn,* 140 Cal. 563 (74 Pac. 147); *Alcorm v. Chicago & A. R.*

*Co.,* (Mo.) 14 S. W. 943 (16 S. W. 229) ; *Parker v. United States,* 1 Ind. T. 592 (43 S. W. 858).

The objection that evidence is incompetent is sufficient where the evidence is incompetent for any purpose. 9 Encyc. of Evidence, 73; *Iverson v. McDonnell,* 36 Wash. 73 (78 Pac. 202) ; *State v. Hendrick,* 70 N. J. L. 41 (56 Atl. 247) ; *Hynes v. Hickey,* 109 Mich. 188 (66 N. W. 1090) ; *Dedric v. Hopson,* 62 Iowa 562; *Texas & P. R. Co. v. Gay,* 88 Tex. 111 (30 S. W. 543). The objection that testimony is incompetent and immaterial is sufficient, where the grounds of objection are discernible. *Guarantee Co. v. Phoenix Ins. Co.,* 124 Fed. 170. If the evidence could not have been made competent, then the objection is sufficient. *Tooley v. Bacon,* 70 N. Y. 34. It has been held, when the opinion called for is wholly incompetent on its face for any purpose, and the ground of objection could not be obviated, a general objection is sufficient. 9 Encyc. of Evidence 92; *Wallace v. Vacuum Oil Co.,* 128 N. Y. 579 (27 N. E. 956) ; *Rodgers v. Fletcher,* 13 Abb. Pr. (N. Y.) 299. Where evidence is immaterial, an objection to it as immaterial is sufficiently specific. *M. Groh's Sons v. Groh,* 177 N. Y. 8 (68 N. E. 992) ; *Turner v. City of Newburgh,* 109 N. Y. 301 (4 Am. St. 453) ; *Ward v. Kilpatrick,* 85 N. Y. 413.

"An objection to evidence as 'irrelevant' is sufficient, where the irrelevancy appears from the evidence itself." *McDermott v. Judy's Admr.,* 67 Mo. App. 647; *Owen v. Frink,* 24 Cal. 171.

So, if the particular objection appears on the face of the evidence itself (*Wood v. American Life Ins. Co.,* 7 How. [Miss.] 609) ; or where the evidence is not admissible for any purpose (*Western Coal & Min. Co. v. Berberich,* 94 Fed. 326; *Taylor v. Adams,* 115 Ill. 570; *State v. Hilsabeck,* 132 Mo. 348 [34 S. W. 38] ; *Neely v. State,* [Tex.] 56 S. W. 625). Whether or not it aids appellant that less definite objections than it made will base review is, however, not

very controlling. But some light is shed upon whether its objections were sufficiently specific by a consideration of cases wherein objections have been held not to be sufficiently specific for review. We said, in *Brier v. Davis,* 122 Iowa 59, at 61:

"According to some authorities, the sweeping assertion that testimony is 'incompetent and immaterial,' or 'irrelevant, incompetent and immaterial,' does not apprise the court of the precise point upon which counsel relies, and error cannot be predicated upon the refusal of the court to entertain it. Jones on Evidence, 897."

In *Johnston v. Cedar Rapids & M. C. R. Co.,* 141 Iowa 114, at 116, witnesses testified, over the objection of incompetent and immaterial, that plaintiff complained, at different times after her injury, of pain in her back. On appeal, it was insisted that:

"This general exception to the rule of evidence which excludes proof of a party's declaration in his own favor should be restricted, at least to the extent that such declarations made in contemplation of the institution of an action to recover damages, or after such action has been commenced, should not be admissible."

We say that the objections in question do not raise such a distinction. In *Hanrahan v. O'Toole,* 139 Iowa 229, at 236, letters were offered as tending to prove the mental soundness of the writer. Objections were made on part of the contestant that these were "incompetent, irrelevant, and immaterial." On appeal from overruling these, it was argued that the letters were personal communications between the witness and the deceased, and should have been excluded, under the statute. And we said:

"Counsel overlook the obvious fact that the objection made on the trial was to the competency of the testimony, and not to the competency of the witness under the statute."

In *Krause v. Redman,* 134 Iowa 629, at 632, the deposition of the seller of land was taken on stipulation, and both parties took part in the examination. The deposition was duly certified and filed. No objections to it or motion to suppress it, in whole or in part, were filed, and it was offered and admitted in evidence on behalf of the defendant. On appeal, it was urged that its admission was erroneous, "because the certificate of the notary should have been produced, offered, and read in evidence, and the endorsement of the clerk upon the deposition should have been produced, offered, and read in evidence." We say that we are wholly unable to appreciate the force of this contention; that the only objection made when the deposition was offered was, "The plaintiff makes the formal objection that no foundation has yet been laid for the introduction of the evidence;" that, when defendant's counsel read in evidence the stipulation upon which the deposition had been taken, and repeated his offer, and stated the name of the notary, the date when taken, and the date of filing, objection was again made that defendant had laid "no legal, sufficient, necessary, and competent foundation" therefor; that the objection thus made was a mere generality, and does not direct the attention of the court to any alleged defect in the deposition or in its certification; that, if counsel believed any defect existed, or had in mind any reason why the deposition should not have been admitted, it was easy to disclose it; and, failing so to do, they are not in position to urge an exception to the ruling refusing to entertain the objection. In *Longan v. Weltmer,* 180 Mo. 322 (79 S. W. 655, at 661), an objection to a hypothetical question asked of a physician was "that it is irrelevant, immaterial, and incompetent, and not a proper hypothetical question." It was held to be insufficient to call the court's attention to any particular objection to it. In *Wellington v. Pelletier,* 173 Fed. 908, 910, as to a notice required by statute, the objec-

tion was that the notice was not sufficient under the law;
and this was held to be insufficient. Certainly, these dis-
approvals of lack of definiteness do not condemn such ob-
jections as were made in this case. True, in *Neel v. Smith,*
(Iowa) 147 N. W. 183 (not officially reported), it is said
that, under the peculiar conditions present in that case,
it was not sufficient to object that evidence is "incompe-
tent, immaterial, and irrelevant, and not the proper meas-
ure of damages." But it should be borne in mind, first,
that the objections at bar went much beyond this, and that
the situation in the *Neel* case was peculiar. The case de-
clares that the petition was in such condition that, there-
under, the court could adopt any proper rule of damages,
and defendant objected to all the evidence as to damages un-
der any rule. Some evidence was admitted as to one rule
for measuring the damages. We say this is permissible un-
der some circumstances, because it is sometimes difficult
for the trial court to determine what rule will be applicable
when the evidence is all in; that the court stated the ques-
tion would be taken care of in the instructions, and it was
done; and that there was evidence to support the rule
adopted; that plaintiff sought to show the difference in
value of a machine before and after it was injured, and de-
fendant objected, and yet insists, on appeal, and plaintiff
concedes, that that is a proper measure of damages. So
defendant and appellant admits on appeal that the ruling
was right, and at the same time urges that the trial court
erred in overruling his objections to this evidence. And
it is in that connection we said that the objection was mere-
ly that the evidence was incompetent, irrelevant, imma-
terial, and not the proper measure of damages, and that this
was not a proper objection. There was no need to speak to
the quality of the objections at all. The most specific ob-
jection would not avail an appellant who concedes that it
was rightly overruled, and still urges the ruling as a war-

rant for reversal.   The main reliance of appellee is upon *General Fire Ex. Co. v. Beal, etc., Co.,* 110 Ark. 49 (160 S. W. 889).   But in our opinion, such reliance is founded upon a misconception of what the case decides.   It does not deal with what is or is not a sufficiently definite objection.   An objection was made which was perfectly specific, but the complaint lodged by this objection was untenable, and itself urged an incorrect measure of damages.   It urged against the admissibility of testimony on value that "the rule of law is not the market price of these goods nor the selling price, but the cost price to the company plus freight."   Of course, that is not so.   What goods cost is not necessarily the measure when they are destroyed, because it might then cost more to replace them than their cost when they were bought.   As said, this could not be and is not a rule as to what is or is not a sufficiently specific objection, and no such point is mooted.   As for the rest, the case holds that, if an erroneous measure of damages is put in evidence without objection, objection cannot be first made on appeal.   We are abidingly satisfied that sufficient objection was made to raise whether the market value measure adopted below is correct, and what the correct measure of damages is.

<div align="center">2-a</div>

It is absolutely clear that sufficient objection was made to compensating one whose goods have been destroyed, by allowing him the price at which he had directed his agents and employees to sell these goods.   One objection was, that "there can be no market value of the article when its current price is not affected by competition, where competition is disarmed by combines or monopoly."   Another was:

"It seems to me we ought to have the right to examine this witness, to find out whether or not the price that he is now attempting to put on this machinery is the price that is fixed by a monopoly, or by this firm that has no competition, and that has possibly killed off any competition.

* * * I am justified in saying this from the very fact that they are refusing to permit us to find out from the witness whether he knows about these various things we think it does exist, and I say so professionally. We think we can develop some of the facts that will indicate it in this examination at the present time on cross-examination. And if it does affect them, I say that their price to the trade or to whomsoever they sell is not the proper measure of damages here at all, but it is what the machinery actually cost them to manufacture, or the party that they buy from. But I do think we are entitled to develop from this witness whether or not there is any competition, and if there is not, if it is not true that they fix the price themselves, and fix it at whatever they want to fix it."

Again, it was moved to strike out testimony as to market value "for the reason that the testimony now shows that this witness testified to the price at which these goods were sold, and that the price list was made up in Chicago, and was not governed in any way by competition in the market, and that, therefore, the price at which it was sold is no evidence of market value, and is wholly incompetent for that purpose, and the only measure of damages is the actual loss or damage that was incurred by the plaintiff which would be determined not by this kind of testimony."

At the end of re-cross-examination, Mr. Markley moved to strike out Exhibit F, for the reason that the testimony shows these prices were fixed in Chicago, and are not variable; that there is no competition about them, and it is no evidence of market value, but is simply an arbitrary price fixed, from which no variation could be made. And to the offer of Exhibit F, a list made by a witness, with prices noted against each article listed, the objection was:

"Defendant objects for the reason that the same is a mere compilation made by this witness from books kept, according to his testimony, by various bookkeepers, partly

by himself and partly by him, and that the sources from which the entries are made are not known to the witness, and the prices fixed have been testified to by him to be the prices fixed by the International Harvester Company in Chicago, .and sent here for their guidance,—a price from which they were not permitted to vary; and it was not, therefore, a competitive price, or in any way to be received as evidence of the value of this property."

III. Having settled that the objections were sufficiently specific, it remains to consider whether it was error to overrule them.

It will be remembered witnesses were permitted to give the market value at which the destroyed goods were selling in Mason City in the ordinary course of trade, and what their value was on that market at the time they were burned up. It is the position of appellant that the true measure of compensation is the cost of replacement. The question is whether "market value at Mason City" is not an improper measure, even though the witness said, inferentially, that the goods had a value in that market.

4. DAMAGES:
measure: fair
compensation
to loser, with
least burden
to one caus-
ing loss.

The property destroyed consisted of staple farm machinery and binding twine. If, at the time of the destruction of these goods, there was no market value at Mason City for either farm machines or binding twine, then it would manifestly be error to allow plaintiff to put in evidence based on a nonexistent standard. Stated differently, such testimony should not have been received in that event, because, in the absence of a market value at Mason City (as will be shown presently), the measure of damages was the price at which the goods could be substituted for in kind at the nearest or best place in which such goods had a market value, perhaps plus transportation, and perhaps plus an allowance for damages caused by delay in having the sub-

stitution effected. This brings us to where it becomes nec-
essary to clear up the dispute presented here. We do not
understand appellee claims that if, say, corn planters had *no*
market value in Mason City, it might put in testimony as-
serting that such planters had a given value in the Mason
City market. We do not understand appellant to claim
that such machinery as was destroyed had *no* market value
in Mason City. The point which appellee must meet is
this: Plaintiff shipped a large quantity of staple farm im-
plements and of twine to Mason City; it stored them there
in a storage plant not owned by itself; the goods were so
stored for the purpose of distribution, and of being sold to
dealers in a territory in and about Mason City, compris-
ing 13 counties. Appellant says it is self-evident that there
must have been cost, expenditure, loss of interest, and de-
preciation before these goods could be sold, and that there
was a probability that some might remain unsold. This is
not the place to go into detail on what it would or might
have cost the appellee to sell its goods, and what, therefore,
was the real loss caused by the burning of these goods be-
fore their distribution and sale had been effected. It suf-
fices to say at this point that appellant does not claim that
farm machines or twine had no market value in Mason City,
but that a stock of goods yet to be sold, with expenses and
loss yet to be met before the stock was realized upon, is not
to be paid for, if destroyed while stored at Mason City,
on the basis of the market price in that city for mere items
of such a stock—not that a harvesting machine, which was
a part of this stock of goods on storage, had no value in
the Mason City market, but that the goods there stored
were not intended to be sold on that market, and that the
value of some item of these goods on that market is no in-
dicium of what plaintiff lost through a fire which prevented
the carrying out of its plan to sell all of the stock in
said 13 counties—prevented its realizing what it would

have obtained had it been permitted to pursue that plan to an end.

It may not be doubted that the basis of all damages rules is a fair compensation to the loser with the least burden to the one who caused the loss. See *McDonald v. Unaka Timber Co.,* 88 Tenn. 38 (12 S. W. 420) ; *Burr's Ferry, B. & C. R. Co. v. Allen,* (Tex.) 149 S. W. 358; 1 Sutherland on Damages (3d Ed.) Section 12; *Chicago, R. I. & P. R. Co. v. Word,* (Tex.) 158 S. W. 581; *Jacksonville, T. & K. W. R. Co. v. Peninsular Land, etc., Co.,* 27 Fla. 1, 157 (9 So. 661, 679) ; *Sears v. Lydon,* 5 Ida. 358 (49 Pac. 122). If cost of replacement is the true measure within that rule, it does not matter that the stock could not have been replaced with goods obtainable on the Mason City market. In some of these cases, and in many other authorities, one application of the rule is that while, ordinarily, fair compensation is afforded by paying market value at the time when and place where property is injured, yet, if there be no market value at that place, by reason of want of dealers, or some other reason, then actual value at such place is ascertainable by proof of market value in other places at which the goods can be bought; and fair compensation is made by paying what is market value at the nearest market in which the lost goods may be substituted for in kind, and, perhaps, cost of transportation added. See *McDonald v. Unaka Timber Co.,* 88 Tenn. 38 (12 S. W. 420); *Grand Tower Co. v. Phillips,* 23 Wall. 471 (23 L. Ed. 71, 74) ; *Chicago, R. I. & P. R. Co. v. Word,* (Tex.) 158 S. W. 561. When a stock of merchandise is involved, the measure of damages is the cost of such stock in like quantity at the place of the alleged trespass, if purchasable there in such quantity; otherwise, it is the wholesale price of such goods on the nearest market where they can be purchased in like quantity, with necessary cost of transportation added. *Sears v. Lydon,* 5 Ida. 358 (49 Pac. 122). To the same

effect is 2 Mechem on Sales, Section 1820.   And see *Yellow Poplar Lbr. Co. v. Chapman,* 74 Fed. 444; *Jacksonville, T. & K. W. R. Co. v. Peninsular Land, etc., Co.,* 27 Fla. 1, 157 (9 So. 661).   The market value of goods to appellee immediately before the injury was what such goods would have cost in the usual market where same could have been purchased, plus the expense or cost incident to shipping them to appellee's place of business.   We do not agree to the contention of appellee that this pronouncement in the cases is dictum.   See *General Fire Ext. Co. v. Beal, etc., Co.,* 110 Ark. 49 (160 S. W. 889).   However, *Bullard v. Stone,* 67 Cal. 477 (8 Pac. 17), cited by appellant, is of no aid, because, while it does announce that the damages are the price at which an equivalent might have been bought in the nearest market, this is merely in obedience to an express provision of the California statute.

It is no answer that appellee cannot make replacement in the market in Mason City.   As we have seen, and shall presently see, it is controlling that it could replace where it had bought before, or in some other place, and that it would be compensated if defendant paid to it what the cost of replacement would be, wherever appellee was compelled to get substitution made.   No rule of the law of damages permits the injured party to receive more than he has lost.   It must be conceded,—at any rate we think it was proved, —that these goods were staple, and that plaintiff could readily have substituted them in kind.   It appears, to put it mildly, that plaintiff was on close and friendly relations with the International Harvester Company, the manufacturer, and was a heavy buyer from it.   Culbertson testifies that whether these things could be replaced by buying of the International Harvester Company depended, of course, on how much was wanted; and that, if more was required than the output of this manufacturer, replacement could not be made by purchase from it.   But he adds that all of

these things could have been replaced by purchase from the International Harvester Company; that they were staple goods, sold practically all over the world in large quantities; and that the International Harvester Company could any day furnish what was required in goods of the same kind from its factory. It should be noted, too, that the fire occurred on October 7th; wherefore, there was ample time for replacing farm implements and binding twine. The time for using such articles was months away.

IV. It may be assumed that *Clements v. Burlington, C. R. & N. R. Co.*, 74 Iowa 442, 443, holds that evidence of what such goods sold for on the Mason City market is some evidence of what market value of such goods was. But we shall presently attempt to show that it was no evidence of what this plaintiff had lost. Be that as it may, the overruling of the objections made works more than a holding that the value on the Mason City market was a circumstance bearing on what loss had been sustained. It was a holding that plaintiff's loss was the aggregate list price of the items of the stock at the time it was stored in Mason City, to be sold in 13 counties.

It is not seriously claimed that such a stock, stored in Mason City, to be from there distributed and sold, was ever sold on the market at Mason City, and sold for cash at the aggregate of the list price of the items, net. It was not stored there to be sold in bulk on that market. And appellee can hardly expect to be taken seriously in its argument that, as "appellee was a jobber, and had a branch house at Mason City, and employees and salesmen constantly hired there, when the goods were burned, they were already at the market, and the expense connected with their sale had already been incurred." It is self-evident that, on October 7th, time must elapse, and so interest on the investment lost, before

5. DAMAGES: measure: stock of goods destroyed by fire: not market price.

it could be hoped that the cash would be in pocket for binding twine and harvesting machinery. In a lesser degree, this is so of other farming tools. We may take judicial notice that some of the stock would remain unsold in the season immediately following. There was the danger of a bad crop. It is matter of common knowledge that such goods are sold on warranty, and that repairing must be done if the machinery work badly. There were storage charges. It may well be assumed there would be an expenditure for insurance. There must be overhead charge for maintaining the branch office. Appellee had "blockmen" traveling to sell the goods. Though appellee disputes it in argument, it is shown by the witnesses for it, and without dispute, that some of the goods were handled on commission. The witness Johnsrud was furnished and used "commission agency forms." He was asked, "So you had agents working on commission in the various towns and places in this territory, selling the goods on commission, did you?" He answered, "At commission prices on commission goods;" and that the goods handled on commission were "Grain binders, mowers, and corn binders;" and that the "binders did have commission contracts." A reduction from list price was made if twine and cream separators were bought in certain quantities. There was a discount "if the machines are settled for in cash," which is not only a deduction from list price, but indicates there might be loss because of sales not settled for in cash. There was a discount of 7 per cent on manure spreaders. The witness made a list, affixing to each item of the stock the price the plaintiff had directed to be obtained in selling. From the total of this, all the subtractions we have enumerated would make a deduction, even if it be assumed that all the goods would be sold. To let this go to the jury simply allowed a recovery of more than was lost. Receiving such testimony was not error because, literally, there was no Mason City market

for farm implements, but because adjusting damages on that basis would pay plaintiff more than it would have realized had the stock not been destroyed, and it permitted to dispose of it as best it could, in the territory in which this stock of goods was to be distributed and sold. It is a fair summary that the market value of such goods on the Mason City market is an erroneous measure, because the said "market price" is not what plaintiff would have obtained, had it been permitted to sell as it was its purpose to sell.

The exact, ultimate question is whether one who has a stock on hand, who must pay storage and insurance, and must make distribution and sale in a large territory, at the cost of money and time, which distribution and sale may entail waste and loss, may, if that stock be destroyed, recover as if he had already sold all the stock at list price, without deduction for sales, costs, delivery, depreciation, waste, etc.,—may recover as if he had already received cash for the whole stock at the full list price, without any detraction, and then another had negligently destroyed the cash received. We must answer that he may not.

4-a

In 2 Sutherland on Damages (3d Ed.) at the close of Section 445, page 1215, it is said:

"The value of a large tract of land cannot be proven by evidence as to what it will bring when cut up into small farms. The sale in small quantities involves expense, and does not afford a sufficiently accurate basis for determining the value of the whole tract."

And in the second paragraph of Section 447 (Vol. 2, page 1219), the author says:

"The value at which a stock of goods may be sold at retail, standing alone, does not afford a basis for fixing their market value, which is what they could have promptly sold for in bulk or in convenient lots. Between the prices at which goods may be obtained in a market, and at

which they may be sold at retail in the same place, intervene time, expense, and profit, unknown quantities, in the absence of proof."

To the same effect is *Needham O. & P. Co. v. Hollingsworth, B. & Co.*, 91 Tex. 49 (40 S. W. 787), and *Temple Groc. Co. v. Sullivan*, 18 Tex. Civ. App. 281 (44 S. W. 401). *Wehle v. Haviland*, 69 N. Y. 448, was trespass for entering upon plaintiff's premises and unlawfully taking and carrying away her goods under an attachment. It was held that the market value was the measure of compensation due, and that such market value was the price at which the goods could be replaced for money in the market, and not the price for which they are sold at retail. It is therein said:

"The sum at which the plaintiff could have replaced the goods in market would have indemnified her for the loss sustained. * * * The retail value or the price at which goods are sold at retail includes the expected and contingent profits, the earning of which involves labor, loss of time, and expenses, and supposes no damage to or depreciation in the value of the goods, and is dependent upon the contingency of finding purchasers for cash, and not upon credit, within a reasonable time, the sale of the entire stock without loss by unsalable remnants, and the closing out of a stock of goods as none ever was or ever will be closed out, by sales at retail at full prices."

In criticising the position of the appellant, that the retail price of goods destroyed is not the measure of damages where a wholesale stock is destroyed *en masse,* appellee states that plaintiff is a wholesaler, and that it was its purpose to sell the stock in question at wholesale; that the cases cited by appellant merely and rightly hold that there can be no recovery for goods destroyed in bulk, and to be sold at wholesale, on the basis of retail value, on the reasoning that such stock could not be sold at those

prices. It seems to us this criticism criticises away one of the main positions taken by the critic. Concede that plaintiff was a wholesaler, and should not be dealt with as though it were a retailer. But whenever appellee concedes that the destruction of such a stock as this is not to be compensated for at retail prices, because such stock would not have realized the retail price, then it concedes, of necessity, that the goods destroyed here should not be compensated for at the rates at which single items in the mass would sell for on the market of Mason City. Even as the lost stock of a wholesaler is not to be paid for at retail value, the stock destroyed here is not to be compensated for according to "market value at Mason City:" First, because there was no market value in Mason City for a wholesale stock of implements and twine *en masse*, and yet to be distributed into and sold in 13 counties. No one ever sold or could sell such a stock on a Mason City market. Second, because whatever was the list price of the stock, that should not be the measure of compensation, for the reason that the list price of the entire stock could get into the pockets of the seller only after it had made many expenditures, suffered delays, and had succeeded in selling *all* of the stock.

4-b

For breach of contract to deliver to plaintiff daily during a period of five years a specified quantity of logs, the measure of damages is the difference, if any, between the contract price and the price at which logs could, by reasonable diligence, have been procured elsewhere. *Hassard-Short v. Hardison*, 114 N. C. 482 (19 S. E. 728).

Where it was alleged as a basis for special damages that the party was unable to print a certain frontispiece, and for the loss of sales and of subscriptions, a recovery cannot be allowed, even though it appears that the party went to dealers and could not find similar paper, where there was no proof that such paper could not usually be

found, or that it could not be manufactured in time, or that defendants could not find paper answering the purpose. *Parsons v. Sutton,* 66 N. Y. 92.

One may not recover special damage because breach of contract deprived it of a profit on a resale already made, "for such damage might have been avoided by replacing the undelivered lumber by other of like kinds." *Lawrence v. Porter,* 63 Fed. 62, at 66.

Replacement is the standard. Mr. Sutherland in the first book of the third edition of his work on Damages, at page 140, states that, if the party claiming damages is a purchaser, he can recover no more than it would cost him with reasonable diligence to supply himself with the same property, by resort to the market or other source or means of supply; that it is not what he could have gotten for the property, but what he can replace the lost property for. In large measure, this doctrine has support in *Grand Tower Co. v. Phillips,* 23 Wall. 471 (23 L. Ed. 71, 74).

We find nothing that aids appellee, when a careful analysis is made of *Read v. State Ins. Co.,* 103 Iowa 307.

One basis of the rule that replacement is the true compensation is that, where such replacement will lessen the damages and yet compensate the loser, replacement is the true measure, because it is the duty of the injured party to do all he may in reason do to reduce the damages. *Poplar Company v. Chapman,* 74 Fed. 444; *Springfield S. W. R. Co. v. Schweitzer,* 173 Mo. App. 650 (158 S. W. 1058).

In the circumstances, the true measure of compensation was the reasonable cost of replacement, and was not the market value at Mason City. Damages on the basis of that market overpay the plaintiff. Assessing the cost of replacement and anything that may have been lost by necessary delay to the defendant repays just what plaintiff has lost —places it where it is once more in position to get all it can by making an effort to sell its stock to dealers in the 13

counties.

Why should not the court have adopted the same rule here that it did with reference to salvage? It did not leave salvage to the Mason City market. As to it, the court charged that there it was a question (Instruction 10) of "the reasonable cost of restoring it to its original condition," and that the recovery could not be beyond that cost.

### 4-c

If we assume, on the authority of *City Nat. Bank v. Jordan,* 139 Iowa 499, 504, that the witness was competent, yet this is no answer. His competency cannot sustain the adoption of an erroneous measure of damages.

### 4-d

It is true that damages for breach of contract are limited to what the parties intended, and to injuries that could, in reason, be anticipated, but that in tort there is liability for damages that were not and in reason could not be anticipated, so long as such damages could result from the tort, and were, in fact, caused by it. But that does not enlarge the rule that not more than compensation is due. It enlarges the possibility of being made to respond in damages, but it adds nothing to what is a proper measure of damages. See *Farmers' Sav. Bank v. Jameson,* 175 Iowa 676.

V. Let it be conceded that for burning a house and its contents, replacement is not the correct measure of damages. *Burke v. Louisville & N. R. Co.,* 54 Tenn. 451, at 465. Let it be conceded that, where a carrier undertakes to take stock to market, and the stock is destroyed, or its arrival unduly delayed, the measure of damages is the price that would have been realized on the market for the stock, had it reached the market with reasonable speed. Certainly, when the carrier breaches its contract for reasonably speedy transportation to market, the

compensation is the difference between what the shipper was forced to take by reason of the delay and the market price that he would have received had there been no such delay. See *New York, L. E. & W. R. Co. v. Estill,* 147 U. S. 591; *Burr's Ferry, B. & C. R. Co. v. Allen,* (Tex.) 149 S. W. 358, 361; *Northern Trans. Co. v. McClary,* 66 Ill. 233. But this argument is scarcely relevant. A house and its contents are not staple articles of merchandise, obtainable at the factory. It needs but to be suggested, to be appreciated, how difficult, if not impossible, it would be to restore such a house and its furniture in kind. Certainly, if the carrier destroy livestock which it is under contract to carry with due speed, it would not be compensation to give other cattle: first, because it would be difficult, if not impossible, to furnish just such cattle as had been lost; second, if the cattle had not been destroyed, and had been transported with due speed, and, so being transported, would have struck a favorable market, it would not be compensation to furnish other cattle, because, even if they were furnished, there might still be a loss, because they could not be gotten to as favorable a market as the cattle destroyed could have been if transported with due speed. Of course, this is true, also, where the stock is not destroyed, but there is such negligent delay so as that, when they arrive on the market, it is a poorer market than they would have encountered had they been transported with due diligence. In such case, there would be, in the first place, no cattle to substitute for, and substitution would not avoid the loss caused by being forced to sell on a poorer market.

VI. *Buford v. McGetchie,* 60 Iowa 298, *Galliers v. Chicago, B. & Q. R. Co.,* 116 Iowa 319, *Clements v. Burlington, C. R. & N. R. Co.,* 74 Iowa 442, *Sanford v. Peck,* 63 Conn. 486 (27 Atl. 1057), and *Budd v. Van Orden,* 33 N. J. Eq. 143, do not go beyond holding that, in certain conditions,

not present here, the price at which a thing actually sells is some evidence of market value. The case of *Moelering v. Smith,* 7 Ind. App. 451 (34 N. E. 675), but holds that cost of production is no evidence of market value, because, otherwise, market value would be affected by the ability, skill, and facilities of the producer; that the same goods are not of different value on the market, because one manufacturer is able to produce them cheaply, while the production costs another more. The case of *Westphalen v. Atlantic N. & S. R. Co.,* 152 Iowa 232, announces the ordinary rule for measuring damages where there is deterioration and shrinkage in cattle transported by carrier.

*Harvey v. Mason City & Ft. D. R. Co.,* 129 Iowa 465, at 479, *et seq., Pope v. Filley,* 9 Fed. 65, and *Showman v. Lee,* 86 Mich. 556 (49 N. W. 578), are of no help to either party, and do no more than to fix rules for the allowance of damages which, no matter how correct, have no application whatever to this case. For instance, the last-named case declares that, where property upon which one has a chattel mortgage is converted, he is not limited to what the property would have realized on a forced sale under the chattel mortgage. The case of *Burr's Ferry, B. & C. R. Co. v. Allen,* (Tex.) 149 S. W. 358, declares that the measure of damages contended for there was an impossible measure.

It was error to receive the testimony that has so far been dealt with.

VII. Instruction 26, offered by defendant, was that the value of any articles destroyed is not to be determined from the selling price of such articles, if such prices were arbitrarily fixed by the seller's board of directors at Chicago, or elsewhere. Market value is only a criterion of real value of an article when it is sold in an open, competitive market. While we find nothing in *Voorhees v. Chicago, R. I. & P. R. Co.,* 71

6. TRIAL: instructions: requested instructions: curing error in admission of evidence.

Iowa 735, at 741, that approves such an instruction as this,
we think it is self-evident that an instruction embodying
the essence of the proposed one should have been given.
We so hold because there was error in the
7. DAMAGES.      taking of evidence, which such a charge
   market value.   might have cured.   It follows we can ap-
prove neither the reception of such evidence nor the re-
fusal to charge as prayed.

Over apt objection, the court permitted plaintiff to put
in Exhibit F.   This exhibit was a list made up by the
witness Johnsrud.   It itemized the articles destroyed, and
set down a price against each item.   One ob-
8. DAMAGES:       jection made to this exhibit was, in effect,
   market value:   that these prices could not be considered
   price list.      because they were but a statement of the
price which the plaintiff had set upon the articles as the
price that its agents should exact of buyers.   It appeared
overwhelmingly that the accusation of the objector was true.
Defendant made demand for a letter and price list sent
out, "showing the prices at which they were to sell all
these different articles stated in this list" (Exhibit F) ;
that plaintiff produce "the price list sent out from the gen-
eral offices to Mason City, the price of all of the different
articles shown in Exhibit F or Exhibit G, and the letter
which accompanied the same, the last one before the fire
of October 7, 1910."   In response, plaintiff produced the
letter, Exhibit K.   The witness then stated that there was
a selling price, or list, or letters, sent out to the branch
office at Mason City from time to time, and that he had
brought them with him; that he had received price list,
letters, or directions "with reference to the selling price of
goods;" and that these lists "may come at different times;"
that a "schedule of prices" was sent out to him; "and these
schedules of prices showed the prices that were fixed by
plaintiff for the sale of these various goods;" the "price

contained in these lists was the original source of advice; we got a price from the general office, and sold at these prices." The witness gives the history of the system as follows: In 1908, he got letters "changing prices made before, with some variations;" that a book in his hand and referred to by him was as to some machines "made up and continued along from these prices previous to 1908;" that there were no changes on harvesters or binders between 1907 "and the date of the fire, October, 1910;" advice as to prices was given by modifications received, from time to time, from the Chicago office; he got no price list for either 1909 or 1910, but he "had letters or information from the company as to the changes on prices or the price that they should be sold at;" the letters "K" and "K 1," a correction of "K," are the instructions the Mason City office had "with reference to the selling price of these machines, and are the only schedule or price list received from the Chicago office during 1909 and 1910, with reference to the sale of this machinery;" and " 'K' was sent out in 1909, to govern the prices for 1910." Exhibit K is of date July 28, 1909, and states "that the contracting season for 1910 is now here, and the writer wishes to inform that, except a reduction in rakes and delivery rake transports, no change in price is contemplated for 1910;" that there will be no change in the price of windrow mowers, and that the price of the International Rake or Scratch Loader will be the same as the price on the Windrow Loader; and "you can make a reduction of $2.50 in the price of the Swach and Windrow Loader for 1910 from the price named you in 1909." The witness added that the office received Exhibit K 2, and that same was a letter to govern the 1910 prices on the binding twine, and directed the agents here what the selling price would be.

He makes no pretense of having any knowledge of the value of the articles listed in Exhibit F. He admits that

these lists were "the original source of advice," says that goods were sold at the prices so fixed, and these sales entered on the books, and the list "Exhibit F" was made up from these book entries. But he again admits that the sales put on the books were sales at the list price, "the original source of advice." He admits that his knowledge of these sales was confined to sales "reported to me and entered on the books by me." True, he attempts to assert knowledge of "market value." He says, over apt objection, that he knows the fair market price in Mason City of such machinery as plaintiff was wholesaling there in October, 1910; that he "made a notation on Exhibit F as to such market value; that he has a general knowledge "of the price of the machinery and the value of it;" that the value of machinery "is what they can be sold at in the market; and that he has some opinion as to the value of that machinery down here at that time, the market value of it right here in Mason City." He says that, when he testifies as to market value, he testified "from that knowledge as having received those prices and entered them on the books from time to time, and thereby knowing at what price they sold around in this country." When asked if it was not true that, aside from that, he had "no other knowledge or qualification as to market value," and if so, how and what, he answered, "Well, we learn what others sell for." Asked how he ascertained the market value, he answered, "It is the price those goods were selling for in this market, Mason City;" and that "the price we used is what the goods were selling for at that time in the ordinary course of business." If this may be said to be an attempt to claim that the prices set down in Exhibit F are notations of real value, made by one qualified to speak to such value, and based on such knowledge, we have to say that the testimony of the witness as a whole leaves no room for such a claim. We have pointed out the positive statements that the prices in the ex-

hibit were mere replica of the price at which the plaintiff directed the goods should be sold, and that these prices were copied into the exhibit from books which recorded sales made as thus directed. If, in reason, there be still doubt as to what sort of real or fair market value witness had knowledge of, and recorded in Exhibit F, let it be remembered that the stock of goods had no market value in Mason City, and no market anywhere at the price list figures, net. And note what more the witness testifies. He was asked, "Don't you know what the value was?" and answered:

"I can't remember all the prices. I can't remember what the value was on all the machines. Independent of the memoranda I have made, I have no other knowledge or recollection of what the market price was. Q. So that, when you were testifying and reading from this list, Exhibit F, you were depending upon the list to furnish the answer to the questions, wasn't you? A. Yes. Independent of this memorandum I have made, I have no knowledge or recollection as to what the market price was."

Asked if it were not true that he was not answering upon his knowledge or recollection as to prices, he answered, "Yes." He said he had no knowledge of the cost of manufacturing these goods or of the cost of selling them; that he made the exhibit wholly from the books, and depended upon them "wholly" for the prices to be set down in the exhibit. Finally, that Exhibit F tallies with the price list sent to him; that the prices attached to the items in Exhibit F are the prices that were fixed by the officers of the company in Chicago, and sent out here; "I had no right to vary;" that, with the exception of discounts and freight, "I regarded that selling price which the company sent out from Chicago as the market value. I had no right to vary;" that he "testified yesterday that the items I set out in this exhibit and prices attached thereto were the prices that were fixed by the officers of the company in Chi-

cago and sent out here, and I regarded that selling price which the company sent out from Chicago as the market price, and so treated it, with the exception of the discounts and freight, because we had no right to vary from it in any way;" and that, "in having that word 'price' written there, I had in mind this price list and these prices at which I was directed to sell, and had sold some of this kind of goods." Culbertson, the only other witness who speaks to this matter, said that this price that is sent out to the agents from Chicago is made up by the sale department of the plaintiff.

"Q. The plaintiff fixed the prices on all their goods, didn't they? A. They sent out a catalogue—yes, sir."

A price list book, Exhibit I, was prepared. It was made up from the lists sent by the general office to the Mason City branch.

"Q. [to Johnsrud]. I call your attention to this book I hand you,—did you compile it from these different letters and schedules a price list? A. Yes, sir, the book you have just handed to me is one of those books that have been compiled from these different letters and schedules. The purpose of the book is, it gives the various prices on all the different things, and we use that book in the office. The blockmen use it, and other agents do. These blockmen and other men, traveling men, traveling around trying to assist in the sale of these goods, use a book similar to the one I have in my hand, and I made out a number of these books. This book is the one for 1910, and was compiled from different sources. Q. The prices contained in this book referred to were fixed in Chicago several years ago, and sent out by this company to their local agents,—the prices on these various things you have testified to here, binders and things of that kind? A. Well, yes, it was sent out to the different dealers. It was also sent to us. Q. State what records of the office you used in extending and

getting the figures shown in this Exhibit F. A. I used a book similar to the one that the blockmen and other traveling men around trying to assist in the sale of these goods use. A book similar to the one you have in your hand."

It cannot be said the jury did not follow this line of testimony, to wit, prices set out in Exhibit F. All indications are that it did follow said line.

On the whole, it is absolutely clear that what the court allowed the jury to act on was testimony that each item in the stock stored at Mason City was worth a sum stated in an exhibit, which sum was the price put on each item by the seller as the price which the agent of the seller should demand from the dealer who desired to buy. If payment is made on this basis, it is manifest the owner would get the price he himself had placed on his own goods in his direction to his agents at what price to sell. As well say that, where two stacks of hay are destroyed, one must be paid for at market price, unless a stack like it is furnished, but that the other has its market value fixed at the sum the owner told an employee he might sell that one stack for. See *Lovejoy v. Michels,* 88 Mich. 15 (49 N. W. 901), having considerable bearing on this question.

7-a

We cannot see how the fact, if it be one, that there was competition in selling the machines, destroys the objection that the prices in the exhibit were arbitrarily fixed by the plaintiff. When it is attempted to obtain compensation for the burning of such machines, does the fact that there would have been competition if the machines had remained in condition to be sold compel one who has negligently destroyed them to pay as compensation whatsoever price the owner has directed his agents to sell at? The objection to Exhibit F that is now relied on is not to the form of the exhibit; hence, the answer that the exhibit was clearly

admissible, on the authority of *Louisville Bridge Co. v. L. & N. R. Co.*, 116 Ky. 258 (75 S. W. 285, 287), as a summary of the facts shown by bulky documents which were adduced for the inspection of counsel, is not a relevant answer.

VIII. It is charged the court erred in receiving evidence tending to show that, at times remote from the date of the fire, engines at work in the yards of defendant permitted the escape of sparks and cinders. That the testimony on this subject was addressed to a time about 17 days before the fire is conceded. The avoidance is that such testimony had no reference to the engines of defendant generally, and limited itself to the engine which the jury found caused the fire. The court limited the consideration of the jury to whether the fire was caused by a specified engine, and we conclude it fairly appears that the testimony to the effect that sparks and cinders escaped was addressed to that one engine. We are of opinion that, though this was observed at a time 17 days before the fire, it was still competent, because, by indulging the presumption of continuity as to defective condition, such testimony tended to show that the engine here in question had, at the time of the fire, defects which might cause a fire.

9. RAILROADS: fires: evidence: sparks and cinders 17 days before.

IX. It is next complained it was error to permit plaintiff to show that, despite the equipment of the engines of defendant with spark arresters and spark-arresting appliances, those engines did emit sparks and cinders. The argument seems to be that, despite the use of the best known devices for preventing fires, some sparks will be emitted from engines thus equipped, and that, therefore, the court, in effect, allowed the jury to hold the plaintiff chargeable with negligence merely because it did not accomplish something impossible of accomplishment. In the last analysis, it is the position of the defend-

10. RAILROADS: fires: spark arresters: emission of sparks: evidence: competency.

ant that, since it brought into court the identical screen spark arrester with which the switch engine in question, was equipped at the time of the fire, and since it appeared, by a careful inspection made within a few hours after the fire, that such screen was new, and in perfect condition, and beyond reasonable criticism, such showing precluded the plaintiff from showing, in opposition, that sparks and cinders were thrown from the very engine thus equipped. If the position of appellant shall be sustained in this, it would work that it could escape all responsibility for injury that might, in fact, be caused by emission of sparks and cinders from its engines, merely by a showing that it had equipped such engines with the best spark-arresting appliances in existence at the time.

This evidence was competent, because showing that the engines did throw sparks was competent on the question of the efficiency of the spark arresters,—on whether the appliances were of the character asserted by defendant. Especially is this so in view of the fact that an expert, introduced by appellee, testified that the engines of the defendant were not equipped with the best spark arresters in general use in October, 1910. It was held, in *Norfolk & W. R. Co. v. Thomas*, 110 Va. 622 (66 S. E. 817), that, in such an action, the burden is on defendant to prove that it has availed itself of all the best mechanical contrivances and inventions in known practical use to prevent the communication of fire, and that, where the particular locomotive which caused the fire is not identified, in a suit for damages by fire charged to have been set by the locomotive of defendant, plaintiff may show defects in the spark-arresting apparatus of any one of defendant's locomotives which may have caused the fire, and defendant may show that all of its locomotives passing on the day of the fire were properly equipped. We are not holding that evidence would be competent which tended to show that engines

other than the one that caused the injury threw sparks and
cinders 17 days before the fire, but do hold that, for the
reasons pointed out, it was competent to receive such tes-
timony as to this one engine.

9-a

It is further urged that, at all events, this testimony
should not have been received in rebuttal. We are not in-
clined to reverse because of the mere order in which testi-
mony was received. Where that is adduced
in rebuttal which, in strictness, should have
been testimony in chief, it requires a strong
showing of abuse of discretion and preju-
dice to induce us to interfere by a reversal;
and no such abuse is apparent. It may well
be assumed that the order of receiving was
nonprejudicial, because no application was made below for
leave to meet the testimony which it is charged usurped the
place of testimony in chief.

11. APPEAL AND
ERROR: re-
ception of
evidence:
order of in-
troduction:
discretion:
harmless
error.

X. It is charged the court erroneously permitted one
Keidle to testify concerning fires found near the place
where the fire in suit occurred, but prior to the day of
that fire. Of course, it is the general rule
that such testimony should not be received.
See *Babcock v. Chicago & N. W. R. Co.*, 62
Iowa 593; *Bell v. Chicago, B. & Q. R. Co.*,
64 Iowa 321; 3 Elliott on Railroads 562; *Lesser Cotton
Co. v. St. Louis, I. M. & S. R. Co.*, 114 Fed. 133; *Gibbons
v. Wisconsin Val. R. Co.*, 58 Wis. 335 (17 N. W. 132). And
we are not persuaded that it avoids this rule to contend, as
the appellee does, that it introduced no evidence of other
fires' having been set, but merely proved that Keidle "dis-
covered the hay near the icehouse on fire some months be-
fore that icehouse was burned." We think it fairly ap-
pears that Keidle was permitted to testify what was, in
effect, as injurious as a statement that fires were found in

12. RAILROADS:
fires: other
fires: evi-
dence.

the neighborhood at a time earlier than the fire involved in this controversy. This witness was permitted to say that, at a time earlier, he had occasion to examine said hay, by having his attention called to it by the fact "that there was a fire there." The close question arises on whether this testimony would not be taken out of the inhibition by further testimony that the defendant was promptly advised of the earlier fires. In other words, the question is whether the existence of the earlier fire is not receivable as bearing on the negligence of the defendant in allowing hay and like material to accumulate, though advised that it was catching fire; on whether failure to do anything after such notice would not constitute a negligent disregard of the danger likely to produce subsequent damage by fire. We find nothing in either *Norfolk & W. R. Co. v. Thomas*, 110 Va. 622 (66 S. E. 817, 820), or *Texas & P. R. Co. v. Wooldridge*, (Tex.) 63 S. W. 905, that throws any light on this inquiry. But in *Abrams v. Seattle & M. R. Co.*, 27 Wash. 507 (68 Pac. 78), an action for destruction of a barn by fire alleged to have originated on a railway company's right of way from a passing train, it is ruled that evidence of fires other than the one in issue is admissible to show the accumulation of inflammable material on the right of way adjacent to the barn, and the condition of the right of way adjacent to the barn at the time of the fire. And *Texas & P. R. Co. v. Wooldridge*, (Tex.) 63 S. W. 905, gives this rule considerable support, and makes notice of the earlier fire important. And it must not be overlooked that a tort is involved, and that one guilty of the tort may be held to respond at least for failure to prevent harm which might in reason be anticipated. And the testimony in question bore directly on whether there was negligent failure to prevent what might have been anticipated.

13. DAMAGES : torts : anticipated damages.

We may grant that, if complaint was made to the

*defendant*, then the case was taken out of the rule. One question is whether any complaint was made. There was, but it was made to "the chief clerk in the superintendent's office." Can that be deemed notice to defendant? May we take notice of what authority such chief clerk has,—of when notice to him is notice to the company? In *Midland Linseed Co. v. American L. F. Co.*, 183 Iowa 1046, we had the question whether a claim for damages caused by the negligence of a railroad carrier was presented to the carrier. It was presented to one who was said to be the "commercial agent" of the railroad. The evidence showed that the person so styled was the "commercial agent" who solicited freight for the defendant road; that the witness had made adjustment of claims with him to some extent, and that the so-called agent had his office "with the ticket agent's office and the commercial office for most all railroads." We held that presenting said claim to him was not a presentation to the company, because there was no competent evidence of what authority he had. It seems that this is applicable here, and that the testimony in question was not made admissible though it did give notice or warning against persisting in not abating a dangerous condition.

XI. The record shows that one Culbertson was permitted to limit the credit defendant should have because of salvage from the burned machinery. He fixed that credit, not by any testimony on personal knowledge of what had, in fact, been received for such salvage, but by stating what sum paid appeared in reports received by him from the factory to which he had shipped such salvage; and he made no claim that he had personal knowledge that these reports showed either the actual value of the salvage or the amount actually paid therefor.

<div style="font-size:small">14. RAILROADS: fires: other fires: as showing notice of inflammable materials on right of way: notice to "chief clerk" insufficient.

15. EVIDENCE: admissibility: hearsay.</div>

We shall not elaborate on this contention, nor cite authorities for our conclusions upon it. It was manifestly incompetent and pure hearsay, and should not have been received. We hold further that, having received it, the court should have attempted to cure the error by giving some such instruction as No. 27, offered.

⟨XII. The sixth assignment is that it was error to receive testimony to show what the market value of scrap iron was, as a means of determining the credit that should be given defendant on account of salvage consisting of undamaged and usable parts of machinery which plaintiff had shipped to the factory. The brief point is that it was error to permit plaintiff to show what the salvage or usable parts of the machinery were worth as scrap iron. We have examined the record with great care, and are of opinion that no objections sufficient to raise this point were made in the trial court.

XIII. The court confined the plaintiff's right to recover to fires that may have been set out by switch engine No. 1055. It was urged by motion for new trial that the evidence does not support a verdict finding that the fire which destroyed the property of the plaintiff was caused by said switch engine; that, at best, the testimony was in equipoise, and that, therefore, plaintiff has not established its case by a preponderance. For reasons pointed out in *State v. Asbury*, 172 Iowa 606, we will not determine this point on this appeal. And see *Seibert Bros. & Co. v. Germania F. Ins. Co.*, 132 Iowa 58, at 61, and *Clark & Co. v. Monson*, 183 Iowa 980.

XIV. One assignment rests upon alleged misconduct of opposing counsel in argument to the jury. Under the rule in *Whitsett v. Chicago, R. I. & P. R. Co.*, 67 Iowa 150,

160, we must decline to pass upon this complaint on this appeal. In view of the fact that there must be a reversal in any event, the existence of the alleged misconduct has become a moot question, and one that may not arise on retrial.

**16.** APPEAL AND ERROR: misconduct of counsel: not reviewed where reversal on other grounds.

On much the same reasoning, we refrain from deciding whether the court should have given the jury additional instructions when it came into court and asked to be cleared up on certain points suggested by the foreman.

For the errors specified herein, there must be a reversal.—*Reversed and remanded.*

LADD, C. J., EVANS and PRESTON, JJ., concur.