THE GENERAL FIRE EXTINGUISHER COMPANY *v*. BEAL-DOYLE DRY GOODS COMPANY.

Opinion delivered November 3, 1913.

1. NEGLIGENCE—SUFFICIENCY OF TESTIMONY.—In an action against appellant for damages to appellee's goods by reason of negligence of the appellant's servants while working on the roof of appellee's store building, evidence held sufficient to warrant the jury in finding that the damage to appellee's goods was due to the negligence of appellant's servants.  (Page 55.)

2. EVIDENCE—OPINION OF WITNESSES—AMOUNT OF DAMAGE.—In an action by appellee for damages to its goods due to wetting, because of the negligence of the servants of appellant in leaving appellee's roof in an improper condition after installing a fire extinguisher system, the opinion of a witness who had a specific knowledge of the subject, by reason of his observation and experience, is competent as to the nature and extent of the damage to the goods, when the witness had examined the damaged goods.  (Page 58.)

3. EVIDENCE—OPINION OF WITNESSES—EXPERT TESTIMONY.—In an action for damages to dry goods, witnesses having a special knowledge of the subject may testify as experts as to the amount of the damage, although they did not examine each piece of goods claimed to be damaged, but, by reason of their familiarity with the business, could tell approximately the amount of the damage. ·(Page 59.)

4. DAMAGES—SUFFICIENCY OF EVIDENCE.—While the testimony of expert witnesses as to their opinion as to the amount of damage done to a stock of dry goods, after they had examined the same, would be insufficient to support a verdict, the verdict will not be disturbed when there was supporting testimony leading to the same conclusion, admitted without objection.  (Page 59.)

5. DAMAGES—MEASURE OF—PARTLY DESTROYED GOODS.—In an action to recover for damages to dry goods which were only partly destroyed, the measure of damages is the difference between the market value of the goods damaged, immediately before they were damaged, and the market value thereof immediately after they were damaged.  (Page 59.)

6.. DAMAGES—MARKET VALUE OF GOODS.—Where appellee's dry goods
were damaged on account of the negligence of appellant, their
market value before the injury was what such goods would have
cost, in the usual markets where the same could have been pur-
chased, plus the expense or cost incident to shipping them to
appellee's place of business, and the market value immediately
after such goods were damaged was what the goods could have
been sold for in the market where the goods were held for sale.
(Page 59.)

7. APPEAL AND ERROR—EVIDENCE—OBJECTIONS.—Where appellee failed
to object in the court below to testimony fixing an erroneous
basis for determining the market value of damaged goods, it is
too late to object to the same on appeal.    (Page 60.)

Appeal from Pulaski Circuit Court, First Division;
*Robert J. Lea,* Judge; affirmed.

*Frank H. Braden* and *Brown & Anderson,* for appel-
lant; *Coleman & Lewis,* of counsel.

1.    The evidence is not sufficient to show negligence
on the part of appellant, and, the burden resting on the
appellee to make out its case, appellant's request for a
peremptory instruction should have been sustained.

2.    The testimony of the witnesses, Epstein, Cohn
and Durst, as to the amount of damage done, should have
been excluded, because they did not qualify as experts in
valuing damaged goods, did not show that they had ex-
amined the same with such particularity as to enable
them to form an opinion, and did not show that they
knew the value of the goods before the damage and
after.    Their testimony furnishes no criterion by which
the jury could ascertain the damage aside from the bare
opinion of the witnesses.    If there is any liability on the
part of appellant, it can only be for the cost of the goods
to appellee less the market value of the damaged goods.
13 Cyc. 148; 91 Ark. 433; 66 Ark. 562; 55 Ark. 329; 107
Ia. 62, 70 Am. St. Rep. 145.

*Mehaffy, Reid & Mehaffy,* for appellee.

1.    Appellant's negligence was clearly established,
as is shown by the record.

2.    The court stated the correct measure of dam-
ages as the difference between the market value of the

goods immediately before they were damaged, and their market value immediately thereafter. 50 Ark. 177; 55 Ark. 333, 334; 63 N. W. 51; 25 S. E. 765.

While "questions of value are largely matters of opinion," juries are not absolutely bound by the testimony of witnesses, but may use their own judgment and experience in such matters, and in this case it is apparent that the jury, under correct instructions, brought to bear their own common knowledge and experience in estimating the damages. Jones on Evidence, §§ 387-389; 42 L. R. A. 769.

The testimony of the witnesses as to the damages was competent. 91 Ark. 128; 86 Ark. 91; 44 N. W. 327.

WOOD, J. The Beal-Doyle Dry Goods Company, engaged in the wholesale dry goods business in the city of Little Rock, was occupying a building owned by Marguerite Miller Fones under the terms of a lease which required the owner to construct and install an automatic sprinkler system, including a tripod and the enclosing of the pipes and other portions thereof in wooden casings. The Memphis Steel Construction Company was employed to erect the steel tripod, upon which the tank rested that supplied the water for the automatic sprinkler system in the building. The legs of the tripod extended from the foundation up through the various floors and the roof of the building, converging under the tank. The holes necessary for extending the legs of this tripod from the foundation through the roof were cut by carpenters preparatory to the work to be done by the Memphis Steel Construction Company in erecting the tripod.

Appellant was employed to install the supply pipe and sprinkling apparatus necessary for the automatic sprinkler system. In connection with this work it became necessary for a conductor pipe to be brought down from the tank through the roof of the building to supply the sprinkler system on the inside with the necessary water. The entire work was completed on the afternoon of Saturday, January 26, 1912. A heavy rain fell the next day. Water came down through the roof of the

building and sides of the walls where the work had been done, and damaged the goods of the appellee.

The appellee sued the owner of the building, the Memphis Steel Construction Company, and the appellant, setting up the requirements of the lease as to the installation of the automatic sprinkler system, and alleging, in substance, that the defendants wholly disregarded their duties by negligently making openings in the roof of the building by negligently erecting and constructing the tripod and pipes connected with the sprinkling system, causing the obstruction of the flow of water in the gutters and on the roof; that they negligently permitted debris to accumulate in the gutters and large volumes of water to accumulate on the roof of the building, which overflowed the gutters, passed through the holes in the roof, and fell upon the goods of appellee, damaging same in the sum of $5,000, for which appellee asked judgment.

All the material allegations of the complaint were denied by the defendants.

The waterfall upon the roof of the building was carried by gutters to the northeast corner directly under the tank, and there flowed through an opening in the wall extending above the roof into the hopper or conductor head of a gutter attached to the wall upon the outside and through the gutter or down pipe to the street or sewer below. After the rain it was ascertained that the outside down pipe or gutter was stopped up by pieces of 2x4 lumber, water-soaked building paper, pieces of shiplap, mortar chips and other debris from the work that had been done on the roof. It was also discovered that the supply pipe coming down from the tank through the roof into the building had been boxed down to the roof and across to the north wall. Nails and spikes had been used in constructing the boxing. The roofing or flashing had been torn and left open. Timbers used in the construction had been set in the gutters so as to retard the flow of the water, and it was claimed by the appellee that all these caused the water to back up over the

openings in the roof, made by the spikes, and in the negligent construction of the boxing around the pipes, and to flow into the building, all of which produced the damage as alleged.

The questions of fact in the case at first were as to whether the obstructions complained of caused the damage, and which of the defendants caused the obstruction.

Judgment, by direction of the court, was in favor of all defendants except the appellant, and it has prosecuted this appeal. So, the question of fact now is as to whether the damage complained of was caused by the negligence of the appellant.

1. The appellant asked a peremptory instruction directing a verdict in its favor, and complains here of the refusal of the court to give this instruction, and contends that there was no evidence to sustain the verdict.

The facts concerning this are substantially as follows: The work upon the building occupied some weeks. During this time one heavy rain and other slight rains had fallen, but without damage to the building. The employees of the other defendants who had work to do upon the roof, and in connection with the tripod, cutting holes and making temporary boxing, etc., finished their work about the 19th of January. These employees testified that they kept the roof swept off each night after finishing their work, and left it free from any material whatever.

On January 17, after the work had practically all been finished, an employee of appellant began work upon the building. He was cautioned to be careful not to leave blocks where they could be washed down into the conductor head and obstruct the flow of the water, and also about nailing into the roof. He was in a considerable hurry to get through with his work. He carried timbers on the roof, consisting of 2x4's and shiplap. This was necessary for constructing the boxing around the pipe from the tank down into the roof, which work was to be done by the appellant. On the top of the boxing was placed building paper and then sheeting or shiplap. After

the employee of appellant had finished his work on Saturday afternoon, there was a heavy rain on the Sunday following.

Banks, a witness on behalf of the appellee, who was called early Monday morning to go upon the roof to repair the defects that had caused the leaking, testified concerning the conditions found by him, as follows: "They boxed right down into the roof, and nailed into the cribbing; they also brought a 2x4 down on the corner facing, and nailed the boxing right into this very corner. They also placed one boxing a little further on the north side of this tripod, that is west of it on the north side. In doing that they had torn the flashing or roofing extending up around this cribbing, and prevented the flow of the water coming in on the north side, as well as part of it on the east side. The flashing was torn by nailing this piece. They nailed a board 2x4 down into the roof. They used some small nails, but there were some spikes used."

The witness states that that was the cause of the overflow in the building. Continuing, the witness stated that he found the conductor-head of the down-spout or gutter choked up, describing the condition as stated above. He then stated that he tore away the obstruction that had been placed there, and repaired his part of the work that had been destroyed. He said that the blocks that were in the conductor-head were 2x4's, such as were used by the employees of appellant in boxing around the pipe. He described the obstructions that he found in the gutter, on the roof and in the conductor-head and down in the down-pipe or gutter. He says the boxing, as he found it on the morning of the 29th, after the rain, was not more than three inches from the wall and came right down to the roof. When he left it he left a passageway for the gutter between the cribbing and the walls about two feet wide. There were heavy rains before the boxing was put in by the appellant around the pipe, and no damage occurred. "The roof didn't leak, because it had not been nailed into." At the time witness and the carpenters finished, they "cleaned the roof absolutely, and

threw the debris over the outside wall.'' A few days before witness and the carpenters finished, there was a heavy rain. Witness went up to see the effect of it, and found everything in proper condition. There was no flooding whatever. The boxing around the pipe and nailing into the roof caused the damage. It could have been avoided. Witness tore those things out of the way, and it is all right now, for the boxing does not extend down to the roof. It could have been avoided to start with had it been constructed as witness left it.

The above testimony was sufficient to warrant a finding that the damage complained of was caused through the negligence of the appellant.

2. Witnesses on behalf of the appellee testified as to the damage to the goods substantially as follows: They were shown the goods stacked up in piles; took a good many of the bolts out, opened them up a yard wide, unwrapped them, and pulled out another stack, and went through that way for about three-quarters of an hour. The main thing they wanted to look into was to see if the goods were damaged, and how much. By opening them up, they not only glanced at them or felt them, but unwrapped or unfolded them so that they could see just what the damage was, and how far it penetrated. They thought their market value had depreciated 50 per cent because of the damage. Goods of that character didn't have to be damaged very much to destroy their market value, if they are spoiled in any particular or injured in any way. That stuff was saturated. They found no bolt that did not contain water discoloration in the damaged stock. They didn't examine each piece.

The witnesses had had experience in the dry goods business that involved a knowledge of the market value of dry goods of different kinds. One of the witnesses stated that he had been in the mercantile business forty years, and ''his experience enabled him to judge accurately, or reasonably so, the market value of merchandise fabrics and things of that kind.'' He says, ''Any damage to such goods at all destroys their original value

way down. The goods were in sight where we could look at them and feel them; could put our hands between the bolts of goods and feel them; saw that some of them, a good many of them, had been discolored to an extent that they would not sell anywhere near their original value; making a general average, we concluded that 50 per cent of the original value was destroyed by the water that got on the goods."

The appellant at the time objected to the testimony of these witnesses, the specific ground of the objection being, because they were not properly qualified to testify as experts to the value of the goods or the damage to them; that they didn't show that they had examined the goods with sufficient particularity to be able to form an opinion; that they did not show that they knew the value of the goods before they were damaged, and after they were damaged.

At the conclusion of their testimony, appellant moved to exclude upon the same ground. The rulings of the court in admitting and in refusing to exclude this testimony are urged as grounds for reversal.

The testimony was competent. The witnesses showed that, by their long experience in handling goods of the kind that were damaged, they had knowledge of the value of such goods before they were damaged; and the opportunity afforded them for the examination of the goods after they had been damaged was sufficient to enable them to estimate the extent of that damage. It was not necessary for them to count each piece, or to measure the number of yards to the piece. Their familiarity with such matters enabled them to tell approximately what the per cent of damage to the whole lot was by an examination of the piles of goods without a minute examination of each particular piece. The testimony shows that the witnesses made an examination of the goods sufficiently specific and particular to enable them to testify that the goods were damaged 50 per cent of their value. The testimony of these witnesses was manifestly to the effect that these goods, by reason of the

damage they had sustained, were worth to appellee only half as much in the market where appellee would have to sell them as they would have been had they not been damaged. It was the opinion of experts about a subject-matter of which they showed that they were thoroughly conversant. It was a subject-matter, too, that called for and made the testimony of experts proper.

The opinions of witnesses having a special knowledge of a particular subject, a knowledge peculiar to them by reason of their observation and experience in connection with such subject, are generally admissible in evidence. The weight to be given to the testimony of such witnesses is for the jury, but it is competent for their consideration. *St. Louis, I. M. & S. Ry. Co.* v. *Brookshire,* 86 Ark. 91; *Combs* v. *Lake,* 91 Ark. 128. See also *Hutchinson* v. *Poyer et al.,* 44 N. W. 327.

Appellant contends that this testimony did not furnish the jury a criterion for ascertaining the amount of damages, because it did not show the number of pieces, yards, etc. In other words, it did not show such an inventory of the quantity of the goods damaged as to enable the jury to ascertain the amount of the damages. If this were the only testimony upon which the verdict of the jury was grounded, the appellant's contention would be well taken. But the testimony of the above witnesses was supplemented by other testimony, which appellant permitted to go to the jury without objection, that showed that the aggregate value of the goods damaged, according to the inventory taken after same were damaged, amounted to $8,483.56. These figures represented the market value or selling price of the goods in the market where appellee was to sell the same. It was the original price paid by the appellee for the goods plus freight and profit. This testimony appellant permitted to go to the jury, as tending to show the market value of the goods. The witnesses testified that the amount above stated, as shown by the inventory, was the market price.

After the above testimony was admitted, another witness (Warren Doyle) testified that he "assisted in

making the inventory of the damaged goods; invoiced the goods on the second floor, known as the notion department; invoiced them at the market price shown on the goods—our price." The appellant objected to this testimony as follows: Because the rule of law is not the market price of these goods nor the selling price, but the cost price to the Beal-Doyle Dry Goods Company plus freight. That is the loss they sustained.

The testimony of Doyle, and other witnesses to the same purport, tended to establish a false basis for determining the measure of damages, inasmuch as they fixed the market value of the goods at the selling price in the market where appellee could sell the goods rather than at the market value of the goods at the place where appellee might have purchased same immediately before the goods were damaged. But appellant made no objection to the testimony on this account, and the specific objection it raised to the testimony of Doyle could not avail for the reason that the loss or damage to appellee was not to be ascertained by the cost price of the goods to the appellee plus the freight. The cost price of the goods at the time appellee purchased the same, on account of fluctuations in the market, might have been entirely different from what the cost price was in the market where such goods could be obtained immediately before the damage occurred.

The market value of the goods to appellee immediately before the injury was what such goods would have cost in the usual markets where same could have been purchased, plus the expense or cost incident to shipping them to appellee's place of business, and the market value immediately after such goods were damaged was what the goods could have been sold for in the market where the goods were held for sale. But the appellant did not request that the market value be so defined and explained. On the contrary, it only made a general objection to appellee's prayer No. 3, and in its own prayer No. 3 requested the court to tell the jury that "the measure of damages is the difference between what the dam-

aged goods cost the appellee and their market value after the damage occurred.'' This was not a correct rule for ascertaining the measure of damages.

3. The court announced the correct rule as to the measure of damages, where goods are injured but not totally destroyed, in the third instruction, granted at the request of appellee, as follows:

''If you find for the plaintiff, you will assess its damages at such sum as you find from the evidence to be the difference between the market value of the goods injured or damaged, if you find the same to have been injured or damaged, immediately before they were damaged, and the market value thereof immediately after they were damaged.''

The Supreme Court of Georgia, in a case exactly in point, announced the rule as follows: ''The measure of damages which a tenant is entitled to recover from his landlord for injury to goods caused by the leaking of water through a defective roof, in case the landlord is liable therefor, is the difference between the market value of the goods immediately preceding the injury and their market value immediately thereafter.'' *Brunswick Gro. Co.* v. *Spencer,* 25 S. E. 765.

And in *C., B. & Q. Ry. Co.* v. *Metcalf,* 63 N. W. 51, it is held: ''Where chattels are injured by the negligence of another, but not wholly destroyed, the measure of damages is the difference between the value of the chattels immediately before and immediately after the injury.'' See, also, 13 Cyc. 148.

The rule is different where the property has been lost or destroyed through the negligent act of another. In such cases the measure of damages is the value of the property at the time and place of the conversion or total destruction thereof, with interest thereon from that time, as was ruled by us in *Summers* v. *Heard,* 66 Ark. 562. See, also, *Blass* v. *Lee,* 55 Ark. 329; *Kelly* v. *McDonald,* 39 Ark. 387; *Jones* v. *Horn,* 51 Ark. 19. But there is a clear distinction between such cases and the case at bar. The difference between the two is shown in *St. Louis, I.*

*M. & S. Ry. Co.* v. *Biggs,* 50 Ark. 169-179. In that case we approved the following instruction: ''If the jury find for the plaintiff, the measure of damages for any animal they may find to have been killed will be the market value of said animal or animals at the date of said killing with 6 per cent per annum interest thereon from the time of said killing until the present date; and the measure of damages to any injured animal is the difference in the market value of said animal—caused by said injury— just before said injury, compared with its market value immediately after said injury.''

It will be seen that the latter part of the instruction embodied the rule, substantially, as announced by the court in this case in its third instruction.

The evidence, though fixing an erroneous basis for determining the market value, was not objected to, and the instruction announced the true rule for measuring the damages. There was evidence, therefore, to support the verdict.

As appellant did not object in the court below to having the market value determined by the selling price in the market where appellee had same for sale, it is too late for it to make such objection here.

There is no error in the record of which appellant can complain here. The judgment is affirmed.