KENNEDY *v.* CLAYTON.

4-9063                                                      227 S. W. 2d 934

Opinion delivered March 13, 1950.

*A. A. Poff, J. T. Wimberly, Virgil R. Moncrief* and *John W. Moncrief,* for appellants.

*Edwin E. Hopson* and *Williamson & Williamson,* for appellee.

GRIFFIN SMITH, Chief Justice. Damage to growing cotton through use of a poisonous chemical was alleged. From a judgment for $4,460.78 on demands aggregating $15,727.23 the defendants have appealed and the plaintiffs have cross-appealed. Because of overlapping interests the case was difficult to try; but, in the main, incompetent testimony and erroneous instructions are complained of by the defendants. The record discloses that unusual issues were carefully dealt with by adroit and competent counsel under the guidance of a skilled judge whose rulings were not prejudicial, hence each appeal must be affirmed.

•  •  •

Howard Clayton, one of the plaintiffs, owns 840 acres west of Arkansas City, some within three miles of the town. Boggy Bayou separates Clayton's holdings from property owned by the parents of Clarence and Eugene Kennedy. The brothers, as equal partners, share-cropped these Kennedy lands in 1947, specializing in rice. They also raised oats and lespedeza.

A threatened infestation, including coffee beans, prompted Clarence and Eugene to dust the growing rice with a poisonous chemical known as 2, 4-D.[1] Two applications were made: one by airplane July 1, when 1,000 pounds were distributed; the other by hand equipment operated from horseback in August—800 pounds. The defendants claimed that with the slight information they had concerning potentiality of 2, 4-D, they did not think it would drift more than 60 or 75 feet unless carried by winds. To guard against this possibility the Kennedys had it applied during the late afternoon of a calm day, thinking these precautions would prove effective.

With transfer of the suit from Desha to Lincoln County, a substituted complaint was filed alleging that 216.1 acres were let by Clayton to the designated tenants under an agreement that the landlord should receive as

---

[1] The modest chemical name is Dichlorophenoxyacetic acid.

rentals a fourth of the cotton and seed produced.[2] The farm, spoken of as "fairly fresh" buckshot land, had formerly yielded a bale of cotton to the acre. In 1947 the 290.5 acres planted to cotton gave promise of an average crop until, as the complaint alleges, the July application of 2, 4-D was made, affecting all but 74.4 acres. The cotton that escaped was shown to have been planted on land similar in all essentials to that used by the complaining tenants, and to have had the same cultivation, fertilization, and attention. It was therefore used as a basis for determining what yield could have been reasonably expected if the injury had not occurred. All of the plaintiffs had Government crop insurance indemnifying them up to 210 pounds per acre if damage occurred because of drouth, too much rain, insect infestation, or plant disease. Actual per acre production on the unaffected 74.4 area was 399 pounds.[3]

There was substantial testimony in support of the following facts:

The 2, 4-D used by the Kennedys was manufactured by Reasor-Hill Corporation. E. M. Johnson and J. T. Henley, who were engaged in the feed and grain business at McGehee, represented Reasor-Hill as distributors, and prior to July 1 they had recommended to Clarence Kennedy that 2, 4-D be applied. During the morning of July 1 Clarence stopped at the feed and grain store and talked with Roy S. McGehee, a salesman for Reasor-Hill who worked in relationship with Johnson & Henley, and who had previously tried to make a sale when he went to the Kennedy farm with Henley. At that time Clarence Kennedy was told that coffee beans could be economically destroyed or controlled by dusting with 2, 4-D from an airplane. McGehee told Kennedy that in applying the poison the plane "hopper" should be cut off before the

---

[2] Distribution of the land was:  To C. C. Clayton, 82 acres; Joe Britt, 111.3 acres; Leonard Washington, 10.5 acres; G. Dunn, 7.3 acres; Will Ross, 5 acres.  Britt sublet 66.6 acres to Scott Dunham, Estella Dunbar, Henry Green, Joe Edwards, Roscie Jenkins, and James Davis. So, in addition to the principal plaintiff, there were eleven co-plaintiffs. [C. C. Clayton is Howard's brother].

[3] Two of the tenant plaintiffs produced more than 210 pounds per acre, and as to them no government indemnity was paid.

canal was reached—approximately 100 yards back in the rice field. This, he said, would effectively prevent the chemical from spreading to other areas. Still later, Johnson and McGehee returned to the farm with W. K. Mc-Clendon, an aviator, and the subject of dusting rice was again discussed. In testifying about these conversations at the feed and grain store July 1, Clarence said: "Well, I more or less decided *when* [the chemical] should go on. I went to McGehee that day and talked with Mr. Johnson and the airplane man, and they decided we would put it on in the late afternoon."

There was competent testimony that Clarence Kennedy had been told that the chemical would "drift," that it was "poisonous," and that it was injurious to cotton. While conceding this, Clarence maintained that he had been informed only that the danger was to nearby tracts, hence he was not put on notice that damage might attend the distribution he authorized.

The destructive potentials of 2, 4-D are emphasized in *Chapman Chemical Co.* v. *Taylor,* 215 Ark. 630, 222 S. W. 2d 820. See *Burns* v. *Vaughan, ante,* p. 128, 224 S. W. 2d 365. Appellants, however, say that their information in respect of possible damage attending a drift to other lands was confined to what they had incidentally heard; that in 1947 much less was known about the danger cotton would be subjected to through use of the material; and no one suspected that in an ordinary atmospheric calm 2, 4-D would drift beyond the protective area the defendants had sought to establish when the aviator cut off the distributor feed before reaching the canal. Therefore, say appellants, the Court erred in instructing the jury that they would be liable for a failure to exercise a degree of care "commensurate with the known danger, if any, involved in the use." The words "known danger" are complained of.

An instruction, copied in the footnote, defined negligence in its application to the defendants.[4] Each side ob-

---

[4] The instruction, in part, was: "If you find from a preponderance of the evidence that the Kennedys had, or in the exercise of ordinary care should have had, knowledge of sufficient facts to have caused

jected: the appellants because, as they insisted, the instruction "left out of consideration any knowledge of the defendants as to any dangers to be apprehended by their acts; . . . and also [omits] the element of time at which the alleged acts occurred, and [the instruction] is abstract." Cross-appellants objected generally, and specifically because liability was based on ordinary care alone.

Another instruction told the jury that if it should find for the plaintiffs, the measure of damage would be "the actual cash value of each of such plaintiff's crop at the time of its destruction, with interest thereon from the date of the injury at the rate of six percent per annum." Only general objections to this instruction were made by the plaintiff. The defendants objected specifically, but for reasons other than the reference to interest.

The principal objections made by the cross-appellants are that the verdict was inadequate, and that the Court erred in not giving certain instructions relating to the ultrahazardous nature of the activity, and in not declaring as a matter of law that liability was absolute when it was shown that the defendants directed use of the chemical.

An initial objection by the defendants came when the Court had finished stating what the issues were. While the record does not show that the trial judge read from the complaint, a comparison of its text with what the Court actually said is conclusive of the contention (not denied) that the complaint was used as a basis for the judicial explanations. *After* the reading had been completed the defendants objected, but did not move that the jury be discharged.

If it should be held (as has sometimes been done) that it was error to read from the pleadings, the answer here is that the objection came too late.

---

an ordinarily prudent person, in the same or similar circumstances, to believe that the 2, 4-D dust might reasonably be anticipated to damage the plaintiffs' cotton, and that such dust put out by them did in fact drift upon plaintiffs' cotton and damage the same, then your verdict should be," etc.

Instructions given, refused, and modified, and the objections and discussions attending each, cover 29 pages of the record. The Court, after considering the suggestions offered by each side, summed up the issues and declared the applicable law through independent instructions, to which was added some of the suggested matter. A discussion here of all of the objections would not be useful in setting a precedent. On the whole the jury was correctly informed regarding the applicable law; nor is there substantial merit in the argument that effect of some of the instructions was comment on the facts.

An objection to the form of the verdict discloses apprehension by the defendants that the jury might either disregard defense testimony tending to minimize damage sustained by some of the plaintiffs, or confuse their collective rights in a way to prejudice the defendants. They also expressed fear that inclusion of the words, ". . . with interest at the rate of six percent from [blank]" might lead the jury to believe it could assess interest on an unliquidated demand.

The Court did not err in approving the form of the verdict. The plaintiffs were within the statute authorizing jointure in one action "in respect of or arising out of the same transaction, occurrences, or series of transactions or occurrences where questions of law and fact common to all of them will arise." Ark. Stats., § 27-806.

Howard Clayton, as the plaintiff in chief, had kept detailed records of separate acreages and production, the cost of cultivation, etc. Where cash rent as distinguished from apportionment in kind was provided for, that was disclosed. The University of Arkansas used some of Clayton's land for boll weevil tests. University representatives were frequently on the premises and watched crop conditions, both before and after the poison was permitted to spread.

Howard Clayton, in a carefully prepared tabulation, had entered the name of each tenant, with the number of acres cultivated, the pounds of cotton produced, (including or excluding seed) Government insurance paid on

seed and on cotton, and other cost-finding items. The insurance paid on all claims was deducted, and the net loss apportionable in severalty was ascertained. Clayton testified that as landlord his loss was $3,931.80.

The County Agent examined the cotton after the chemical had been applied. Detrimental effects were observed within two days. Some of the tenants, said Clayton, sustained greater loss than others, severity depending to some extent upon the distance from the bayou. The substance of Clayton's testimony was that the computations he had made included all basic integrants and that they were factually correct.

A statement by Clayton was that during the latter part of June natural fertility of the planted area was supplemented by a per acre allotment of 150 pounds of ammonia nitrogen. Cultivation was of a kind best suited to soil, season, and location of the crop.

Prospects July 1 were that a bale to the acre might with reason be expected. The fact that lands similarly situated and with like cultivation *did* yield a bounteous crop when not touched by the chemical was pointed to in support of the inference that the difference was due to the spread of 2, 4-D.

The trial Court did not deny to the defendants any facility in presenting to the jury their theory of nonliability, and it is difficult to see how a matter with as many involvements as were presented for consideration could have been dealt with in a more expeditious manner or one more responsive to fair play. We agree with the essential finding that if the defendants did not actually know of the probability that 2, 4-D would drift, the knowledge they had should have put them on notice, resulting in an investigation along precautionary lines.

The duty resting upon the defendants to exercise that degree of care "commensurate with the known danger" must be construed with other language used by the Court; and this, as has been pointed out, would be the danger they actually knew of, or the danger factor

they would have found if, as reasonable men with the information admitted or shown by the proof, they had made inquiry.

Another objection is to the Court's failure to permit the jury to say whether McClendon was a servant of the defendants or an independent contractor. The answer must be that it would make no difference. The instrumentality (2, 4-D) was inherently dangerous to cotton. Liability under the facts here could not be shifted.

We do not think Plaintiffs' Instruction No. 8 was susceptible of the objection that it told the jury that if either plaintiff was damaged, all were. What the instruction said was that if there should be a finding of liability "under the instructions of the Court," then the measure of damage for which a verdict should be returned in favor of such plaintiffs "is the actual cash value of each of such plaintiff's crop (singular) at the time of its destruction." [This is the instruction in which interest from date of the injury "at the rate of six percent per annum" was mentioned].

The instruction shows on its face that it was to be read in connection with others, and that *each* plaintiff's damage was to be a matter of individual computation.

Likewise, appellants' objection to the instruction on interest must be rejected. While the general rule is that interest will not be allowed on an unliquidated claim, there are exceptions. See *Gen. Fire Ext. Co.* v. *Beal-Doyle D. G. Co.,* 110 Ark. 49, 160 S. W. 889, Ann. Cas. 1915D, 791. The opinion mentions *St. Louis, I. M. & S. Ry. Co.* v. *Biggs,* 50 Ark. 169, 6 S. W. 724. There the instruction approved by the Court was: "If the jury find for the plaintiff, the measure of damages for any animal they may find to have been killed will be the market value of said animal or animals at the date of said killing, with six percent interest per annum from the time of said killing until the present date."

Argument by the Railway Company in the Biggs case was that while allowance of interest on unliquidated and contested claims is within the discretion of the jury,

"yet it is not allowed as a matter of right or law." The case was decided in 1887, and Mr. Justice WM. W. SMITH in writing the opinion said that "the modern rule" allowing more latitude than had formerly been permitted was adopted in *Kelly* v. *McDonald,* 39 Ark. 387.

The early case of *Crow* v. *State,* 23 Ark. 684, (1861) recognized the jury's right to allow interest in a judgment on a sheriff's bond where the officer had abused a process in his hands. It was held, however, that an instruction was erroneous when it told the jury that interest would be payable as a matter of law.

In the case at bar the instruction said that actual cash value, with interest from the date of injury, was the measure of damage. The objection was general.

A textwriter for American Jurisprudence, v. 15, p. 590, concludes from a review of many cases that, in general, interest is allowable on damages assessed in actions for injury to real property; also, (p. 588) for injury to personalty. Cases dealing with the subject are collected in *Jacobs* v. *United States,* 290 U. S. 13, 54 S. Ct. 26, 78 L. Ed. 142, 96 A. L. R., p. 1, *et seq.* There are also annotations to *Abrams* v. *Rushlight,* 157 Ore. 53, 69 P. 2d 1063, 111 A. L. R., 1292.

A fine statement of the theory upon which interest may be allowed in cases similar to the one with which we are dealing is in the opinion of Mr. Justice MITCHELL, who wrote for the court in *Richards* v. *Citizens' N. G. Co.,* 130 Pa. 37, 18 Atl. 600. The case is cited in a footnote to Sutherland's Treatise on The Law of Damages, v. 1, p. 1139. Judge MITCHELL said: "Interest cannot be recovered in actions of tort or in actions of any kind where the damages are not in their nature capable of exact computation, both as to time and amount. In such cases the party chargeable cannot pay or make tender until both the time and the amount have been ascertained, and this default is not therefore of that absolute nature that necessarily involves interest for the delay. But there are cases sounding in tort and cases of unliquidated damages where not only the principle on which the recovery is to be had

is compensation, but where also the compensation can be measured by market value or other definite standards. Such are cases of the unintentional conversion or destruction of property, etc. Into these cases the element of time may enter as an important factor and the plaintiff will not be fully compensated unless he receive, not only the value of the property, but receive it, as nearly as may be, as of the date of his loss. Hence it is that the jury may allow additional damages in the nature of interest for the lapse of time. It is never interest as such, nor as a matter of right, but compensation for the delay, of which the rate of interest affords the fair legal measure.''

Whether the criticized instruction was complete in fullness of explanation may be open to doubt,—that is, whether use of the words ''measure of damage'' could have been construed as a statement from the Judge that allowance of interest was imperative. If the rational construction indicated mandatory action, the error was inherent and was reached by the general objection. But viewing the transaction from all of its angles, we conclude that the language was not such as to cause the jury to believe that it could not return a verdict without adding interest, therefore the vice ought to have been called to the Court's attention specifically.

Other alleged errors have been argued. They are without prejudicial significance, and the judgment must be affirmed. It is so ordered.