REASOR-HILL CORPORATION *v.* KENNEDY.

5-504                                                272 S. W. 2d 685

Opinion delivered November 22, 1954.

*Mullis & McCain* and *Talley & Owen,* for appellant.

*George Hester* and *Virgil Roach Moncrief* and *John W. Moncrief,* for appellee.

J. Seaborn Holt, J.  In 1947, S. A. Kennedy and wife, Martha, owned some 1,000 acres of land in Desha County.  A tenant, H. S. Bland, farmed 43 acres of this land in cotton on a one-fourth rental basis for said year. Two sons of the landowners, C. D. and E. S. Kennedy, as tenants, planted approximately 500 acres of rice, and in addition, the owners planted alfalfa and lespedeza on other parts of their farm.  On July 1, 1947, C. D. and E. S. Kennedy bought from Reasor-Hill Corporation about a ton of 2,4-D dust with which to spray their rice crops and on the same date proceeded to spread, by an airplane, and in doing so, seriously damaged a nearby cotton crop belonging to Howard Clayton.  This resulted in a suit by Clayton against C. D. and E. S. Kennedy, alleging that they had negligently sprayed their rice causing damage to his cotton and Clayton recovered a judgment for $5,556.60, which judgment was affirmed on appeal to this court (*Kennedy* v. *Clayton,* 216 Ark. 851, 227 S. W. 2d 934).  C. D. and E. S. Kennedy paid this judgment February 8, 1951.

The present suit was brought by S. A. and Martha Kennedy June 21, 1951, against appellants, Reasor-Hill Corporation, Lyle O. Hill and others but nonsuits were taken as to all defendants except the Corporation and Hill.  The complaint alleged that Reasor-Hill manufactured and sold to C. D. and E. S. Kennedy the 2,4-D dust, which was a dangerous and hazardous chemical, knowing of its dangerous qualities and its effect upon broadleaf plants, through Roy S. McGehee, employed by appellants to sell the chemical to rice farmers to be

spread by airplane. That McGehee sold the chemical to appellees' sons, C. D. and E. S. Kennedy, to put on their rice crop and kill coffee bean plants and that the Kennedy brothers, following the directions of appellants' employee, McGehee, employed Kern McClendon, airplane pilot, to spread the dust and while he was doing so, the dust spread and drifted to adjacent fields, damaging appellees' 43 acres of cotton (farmed by Bland) 30 acres of alfalfa and 30 acres of lespedeza, in the total amount of $6,057.50.

Reasor-Hill filed a third party complaint against C. D. and E. S. Kennedy, alleging, in effect, that the Kennedys were negligent in applying the dust and should judgment be rendered against Reasor-Hill, they in turn should have judgment against C. D. and E. S. Kennedy.

On September 29, 1952, the Kennedy brothers filed a cross-complaint against Reasor-Hill and Lyle Hill, alleging payment of the Clayton judgment, and while admitting their own negligence in applying the chemical, alleged that their negligence was less than the negligence of Reasor-Hill and Lyle O. Hill, and prayed for judgment for the amount paid by them to satisfy the Clayton judgment.

S. A. Kennedy, having died while the present suit was pending, it was revived as to him in the name of H. P. Eldridge as special administrator.

From a jury verdict awarding the administrator for S. A. Kennedy and Martha E. Kennedy, $250 damage to the lespedeza, $775 for the cotton damage and a judgment for C. D. and E. S. Kennedy for $3,250 as reimbursement for payment of the Howard Clayton judgment, is this appeal.

There was substantial evidence in support of the following facts: C. D. Kennedy testified that he did not know that the 2,4-D dust would injure cotton if it came in contact with it, that he knew nothing about 2,4-D dust before appellants' agent, McGehee, called on him three

times before he and his brother bought a ton of it from appellants. He further testified that on his second trip, McGehee, appellants' agent, was accompanied by Mr. McClendon, an airplane pilot. "He brought him along I think possibly to put out the dust." Mr. McGehee told him how the dust would be spread by airplane. "He said to shut your hopper off about 100 yards before you get to the end and there was no danger of it drifting out of the field. . . . It was a day or so later there when I went after the dust, why, Mr. McClendon was there and they seemed to think that day was going to be suitable for putting it out. . . . Yes sir, he (McClendon) came on out with his plane and put it out that afternoon late . . . with his airplane. Q. You spoke about now while ago about the regulation of the hopper—what was done about that? A. Well, he (McClendon) would close his hopper off in about a hundred yards or so of the end of the field and I was on the other side of the field with a flag and I had a colored boy on the other end and we would flag him to show him where to go that way. Q. Could he see too? A. Yes sir, he could see very well. Q. He had his own—did he have a full view of everything there? A. Yes sir. Q. Did you at that time have any idea, Mr. Kennedy, that the distribution of that dust in that way might injure any of your neighbors or your father and mother? A. No sir. Q. If you had had any idea that that dust put out as it was put out would injure your father and mother or any of your neighbors, would you have put it out? A. No sir, I sure wouldn't."

E. S. Kennedy tended to corroborate his brother's testimony and further testified that McGehee, while he, Kennedy, was down in the bayou which divided the Kennedy farm from the Clayton farm on the east, spoke of the irrigation canal separating the rice field from the closest cotton and that McGehee said to him: "Yes sir, he said that irrigation—which irrigation canal ran anyway, I would say, about 60 feet wide is what it was, and he said if we cut it anyway from 100 to 300 feet back in

that field before we got to that irrigation canal, that it wouldn't drift across it.''

It appears undisputed that the 2,4-D dust was known to its manufacturers (appellants) to be highly dangerous and poisonous to broadleaf plants such as cotton and lespedeza. There was evidence that C. D. and E. S. Kennedy relied upon McClendon, an airplane pilot, recommended by appellants' agent, McGehee, to spread the chemical and in so doing it drifted to adjoining fields, damaging appellees' lespedeza and cotton in the amounts awarded by the jury.

Appellants' counsel stated in open court: ''. . . We knew that 2,4-D would kill cotton—we knew it would kill other broadleaf plants—we knew it would drift—we knew it was dangerous to put it out on rice adjacent to cotton fields and we advised every one we sold 2,4-D of such danger. Some of the rice growers took the calculated risk in order to increase the rice yield by killing the coffee beans in the rice with 2,4-D.''

— 1 —

For reversal, appellants first argue: ''S. A. and Martha Kennedy had no right to recover for loss of cotton, since the title to the cotton was in their tenant, H. S. Bland.'' The record reflects that on March 26, 1947, H. S. Bland executed a chattel mortgage to S. A. Kennedy, which contained this recital: ''Party of the first part has bargained, granted, sold, conveyed and assigned and does by these presents grant, bargain, sell, convey and assign to party of the second part, his heirs, administrators, (successors) and assigns, all right, title and interest in all crops planted, cultivated, produced and gathered and to be planted, cultivated, produced and gathered in the year 1947, consisting of 50 acres (more or less) of cotton and 50 acres (more or less) of corn, on what is known as the Hawkins Place farm in Desha County, Arkansas, described as follows: . . . and also the following described personal property: 1 sorrel horse 8 year old, wt. about 1,500; 1 brown horse 8 year

old, wt. about 1,400; 1 grey horse 7 year old, wt. about 1,400; 2 grey mules, smooth mouth; 1 rubber tired log wagon; cultivator and all farm tools, etc.''

At the time this cotton was damaged and the cause of action accrued on July 1, 1947, legal title to the cotton was in S. A. Kennedy (mortgagee). ''In the absence of stipulations to the contrary, the mortgagee of personal property shall have the legal title thereto, and the right of possession.'' (Sec. 51-1006, Ark. Stats., 1947.)

It appears that some time in 1948, S. A. Kennedy (mortgagee) and Bland (mortgagor) had a settlement or agreement relative to the chattel mortgage. Bland, at the time of the settlement, owed Kennedy a substantial balance (about $2,300). The mortgage was withdrawn. Kennedy allowed Bland to take the livestock covered in the mortgage. The cotton was ''split'' and two bales worth approximately $500 were given to Bland, which still left a balance due from Bland to Kennedy of approximately $1,800. Bland agreed to release any and all claim or interest that he might have in the cotton covered in the mortgage to S. A. Kennedy (mortgagee) and in effect, any claim or equity in any cause of action that Kennedy might have for loss of or damage to cotton which occurred. As indicated, July 1, 1947, the legal title was in Kennedy by virtue of the above mortgage.

E. S. Kennedy testified: ''You say the amount due from Mr. Bland to your father was something better than $2,200.00? A. Yes, sir. Q. Was that ever paid or any part of it? A. They had a settlement on that through the cotton, this here cotton here—the way they settled that was they picked that cotton, ginned it and sold it and split the money. The cotton, all this cotton, was just sold what was harvested and that's the way that was done to settle the account. Q. Did they settle the account? A. No, sir—just settled about, oh, my dad got approximately about $400.00. Q. You say your father was paid about $500.00 on this $2,200.00? A. Yes, sir. Q. Was he to receive anything else? A. He was to receive whatever he could get out of the cotton.

254

Q. You mean the lost cotton? A. I mean the lost cotton. Q. I want to ask you this question, whether or not —I notice this mortgage includes some chattels, personal property—did your father take any part of that? A. No, sir. Q. Mr. Bland was permitted to retain it? A. Yes, sir.''

In the circumstances there was no necessity for a written assignment or transfer from Bland to Kennedy of the cause of action for the damages to the cotton since, as indicated, Kennedy held the legal title, as mortgagee, to the cotton.

We said in *Ghio* v. *Byrne,* 59 Ark. 280, 27 S. W. 243: '' 'A mortgagee or lien holder may sue for the conversion of the mortgaged property or for a trespass upon it.' It would be strange if there were not such a remedy for the mortgagee.'' See, also, *Perry County Bank* v. *Rankin,* 73 Ark. 589, 86 S. W. 279.

We hold that S. A. Kennedy and Martha Kennedy, as owners of the cotton by virtue of the mortgage and settlement agreement, were the proper parties to sue for any loss or damage to it.

— 2 —

Next appellants contend that ''the court should have given defendants' Instruction No. 4.'' There was no error in the court's refusal to give this instruction since it was fully covered by Instructions 3 and 5 given at appellants' request.

Instruction No. 4 provided: ''You are instructed that if Reasor-Hill, its agents or servants, advised E. S. and C. D. Kennedy that 2,4-D should not be put out near broadleaf plants, then your verdict will be for Reasor-Hill,'' and Instruction No. 3: ''You are instructed that Reasor-Hill had a perfect right to make and sell 2,4-D dust with immunity, their only duty in connection with such was to advise the users thereof of its characteristics and potentialities.'' No. 5. ''You are instructed that if E. S. and C. D. Kennedy knew that the dust which they

used would spread to adjacent fields and that it would kill broadleaf plants at the time they used it, then your verdict will be for Reasor-Hill, both as to the complaint and cross-complaint."

These given instructions were in accord with the principle of law announced by this court in *Chapman Chemical Company* v. *Taylor, et al.*, 215 Ark. 630, 222 S. W. 2d 820, and *Kennedy* v. *Clayton*, above. Courts are not required to repeat or multiply instructions on any issues.

— 3 and 4 —

Finally appellants argue that "the court erred in giving plaintiffs' Instructions Nos. 2, 4, 5, 6 and 10 over the general and specific objections of the defendants" and in refusing "to direct verdicts against the plaintiffs and third party defendants at the conclusion of their evidence."

We find no error in the giving of these instructions. Appellants' reason for objecting to them was (quoting appellants) that "each of these assumed that as a matter of law the 2,4-D sold by Reasor-Hill was a new and inherently dangerous instrumentality. Nowhere in the record is there any evidence that this 2,4-D was inherently dangerous or that its being put out was an ultra hazardous activity."

Instruction No. 2 provided: "It is the duty of a manufacturer before placing an inherently dangerous chemical product upon the market and soliciting persons to purchase same for particular uses to use reasonable care in making tests to determine whether or not the use of same would likely cause injury and damage either to the user or to others."

This instruction stated a general proposition of law and assumed nothing. See *Chapman* v. *Taylor*, above.

Instruction No. 4 does not assume that 2,4-D is a dangerous chemical but is predicated and conditioned on "if" (and in effect) told the jury if they should find

that Reasor-Hill and Lyle O. Hill negligently sold and negligently encouraged and abetted the use and application of the chemical in such manner as negligently and proximately to injure cotton of Clayton and if you find that Kennedy Brothers are entitled to recover of Reasor-Hill and Lyle O. Hill a share of the damages, if any, then the jury should consider the degree of negligence, if any, of Reasor-Hill and Lyle O. Hill.

It seems to us that it assumes nothing and was a correct declaration of the law as applied to the facts in this case, under the rule announced in the Chapman case, above.

What we have said in connection with Instruction No. 4 applies with equal force to No. 5, which also begins with "if" and assumes nothing.

Instruction No. 6 provided: "The manufacturer of a new and dangerous chemical product who negligently aids, abets or encourages another to do a negligent act proximately resulting in damages to another person is itself guilty as a joint tort feasor or wrongdoer along with the person who so commits the negligent act."

Instruction No. 10: "The manufacturer of a new and dangerous chemical composition who, through its agents and representatives, negligently abets and encourages a purchaser of such new and dangerous chemical composition, if any, to purchase and negligently use and distribute such new and dangerous chemical in such a way and manner as to negligently and proximately injure and damage the property of another person is under the law liable for such damage, or a share thereof, as proximately results from such negligence, if any."

These instructions were of general application and we hold to be correct as applied to the present case.

But, say appellants, the court erred in denying their request for directed verdicts against plaintiffs (appellees) and third party defendants (appellants) at the conclusion of all the evidence. We do not agree. Appellants (among others) requested and the court gave the

following instructions: No. 3 (above): "You are instructed that Reasor-Hill had a perfect right to make and sell 2,4-D dust with immunity, their only duty in connection with such was to advise the users thereof of its characteristics and potentialities." Whether appellants performed this duty was for the jury to determine.

No. 6: "You are instructed that Shannon Kennedy and Martha E. Kennedy in this case are suing Reasor-Hill because Reasor-Hill made and sold 2,4-D dust to their sons, C. D. and E. S. Kennedy, who spread it on their rice field, alleging that Reasor-Hill failed to warn the sons that 2,4-D would spread and would kill cotton, Reasor-Hill has filed a counter suit against C. D. and E. S. Kennedy alleging that they and their agents knew the dust would spread and kill cotton and the damage, if any, was caused by the Kennedy boys. In this connection, you are told that if you find that the Kennedy boys were negligent and that Reasor-Hill was not negligent, then your verdict will be for the defendants," and in No. 7, the jury was told that ". . . Before you can find for said Kennedys you must find that the defendant, Reasor-Hill, was negligent and that negligence was the sole and proximate cause of the injury to Clayton's crop, if any."

Appellants' given Instruction No. 12 contains this language: "You are instructed that it is admitted that the third party defendants, E. S. and C. D. Kennedy were negligent in the application of the 2,4-D dust to their rice crop in July, 1947, and there was a judgment rendered against them in favor of Howard Clayton to compensate him for damages which he alleged arose from the negligence of the said Kennedys. Before you can find against the defendant, Reasor-Hill Corporation, in any amount you must find that they were also negligent in connection with this transaction, and if you should find from a preponderance of the evidence that either of them were negligent, and such negligence contributed to cause any damage which Howard Clayton might have suffered, then the defendant, Reasor-Hill Corporation, would be joint tort feasors with C. D. and E. S. Ken-

nedy, and the said Kennedys, if you find they paid the damages caused Howard Clayton, would be entitled to recover only that amount against Reasor-Hill Corporation as would represent the damages suffered by Howard Clayton caused by the negligence, if any, of the defendant, Reasor-Hill Corporation."

While we do not attempt to detail more of the testimony, after an examination of the entire record, we hold that there was substantial evidence to go to the jury on the question of appellants' negligence and the degree thereof in connection with the spraying of the dangerous chemical dust here and in failing to give proper warning to the Kennedy brothers of its dangers. It appears that every phase of this case was fully and clearly covered in the large number of correct instructions given by the trial court (10 on behalf of appellees and 11 for appellants).

Affirmed.

Justice WARD dissents in part.