FELIX McCOLLUM and EMMA McCOLLUM, d/b/a Mc-COLLUM'S SHOP, Plaintiffs and Respondents, v. JOHN E. O'NEILL, et al., Co-partners, d/b/a O'NEILL-ANDER-SON COMPANY; and the ESKESTRAND BROTHERS CONSTRUCTION CO., et al., Defendants and Appellants.

No. 9239.

Submitted November 17, 1954. Decided December 30, 1954.
Amended on Denial of Rehearing March 24, 1955.
281 Pac. (2d) 493.

586

Messrs. Hall, Alexander & Burton, Great Falls, for O'Neill, et al., Mr. Mas P. Kuhr, Mr. Frederick J. Weber, Havre, for Eskestrand Bros.

Mr. James T. Harrison, Malta, Mr. John Marriott Kline, Glasgow, Mr. M. J. Doepker, Butte, for respondents.

Mr. Weber, Mr. H. C. Hall, Mr. Kline and Mr. Doepker argued orally.

MR. JUSTICE ANGSTMAN:

On September 7, 1950, plaintiffs were operating a ladies' ready-to-wear store in the Arcade Building at Malta.

Defendants were at that time building contractors jointly engaged in remodeling the front of the Arcade Building under a contract with the owner, Mrs. Larcombe.

On September 7th steam escaped from the pipes of the Arcade Building, causing damages to plaintiffs' stock in trade.

This action was brought to recover the damages thus caused.

The amended complaint alleges that defendants in the prosecution of their work negligently and carelessly disconnected the radiators in plaintiffs' place of business and negligently left the pipes leading from the furnace of the heating plant open so that steam could escape into the store room of plaintiffs; that they negligently and carelessly suffered and permitted the pipes to be open when they knew that the heating plant was in operation and in use for the heating of plaintiffs' place of business; that

as the proximate result of the negligent failure of defendants to enclose, lock or otherwise protect and secure the pipes so that steam could not escape, the steam passed or flowed from the furnace in the building to and through the steam pipes and into the premises used and occupied by plaintiffs and escaped from the uncapped pipes filling the premises with large quantities of steam which caused the damages complained of.

These allegations were put in issue by the answers and in addition the answer of O'Neil-Anderson Company set up the plea of contributory negligence. The reply put in issue the affirmative allegations of the answer. The cause was tried to a jury resulting in a verdict in favor of plaintiffs. From the judgment entered on the verdict defendants' have appealed.

The first question presented by appellants is whether there was sufficient evidence to make a case for the jury and to justify the verdict.

As noted from the pleadings, the issue so far as liability is concerned depends upon what was done when the radiator was disconnected.

Gaylord Robertson was the person who disconnected the radiator in question. There was a dispute as to just when this was done. Plaintiffs alleged and offered proof that it was done on September 1st. Defendants claim it was done on August 22nd.

Robertson testified by deposition that he closed the valve on the pipe leading to the radiator as he disconnected the pipe from the radiator. He testified:

"Q. At the time you closed these valves, was there any way that you could determine whether it was completely closed or not? A. Only by feel, Sir.

"Q. That is by turning the handle of the valve itself? A. Yes, Sir. * * *

"Q. Now, you say that you closed the valves, will you describe how you did that? A. Well, they are a wheel-handle type of valve, and I closed them until they were tight.

"Q. Did you turn the valves down before or after you had disconnected them? A. Very much before, Sir.

"Q. You say you turned the valves down tight? A. Yes, Sir.

"Q. Did you find those valves turned freely, or was one of them hard to turn or what? A. No, both of them were fairly free.

"Q. How could you tell you had closed them completely? A. Well, they just get tight, I mean, when they are closed you would have to twist the stem off, or something.

"Q. You turned them as far as they would turn? A. Yes, Sir.

"Q. And you were certain they were completely closed? A. Yes, Sir."

Mr. Robertson's deposition was taken by stipulation of the parties. Plaintiffs offered and were permitted to read a part of the deposition and defendants' counsel thereupon offered the entire deposition.

Defendants contend that the evidence falls short of the requisite proof to meet the requirements of the court's instruction No. 8, reading:

"You are instructed that before you may find a verdict in favor of the plaintiffs and against the defendants, you must find from a preponderance of the evidence,

"First: That such defendants, by and through their servants and employees, negligently left the pipes leading from the furnace of the heating plant open, and negligently and carelessly failed to cap or otherwise close the pipes at the places where the radiators were disconnected;

"Second: That at said times said defendants knew or in the exercise of ordinary care should have known that the heating plant was in operation attached to the furnace, and was then in use for the heating of plaintiffs' place of business; and

"Third: That the negligent acts of said defendants were the proximate cause of the damage to plaintiffs' property, if any.

"Should plaintiffs fail to prove all of the above matters your verdict must be for the defendants."

They contend that the proof instead of showing that the defendants had left the pipes leading from the furnace of the heating plant open, affirmatively shows that they were closed.

The court was right in submitting this issue to the jury. The fact is undisputed that the pipe was not capped. It is also undisputed that the steam which caused the damage came from the open or partially open pipe.

The fact that Mr. Robertson thought the valve was completely closed is beside the point. He could not know that it would completely shut off the steam unless there was steam in the pipe at the time he made the disconnection. Aside from this there was evidence that the person who closed the valve after the damage had been done turned the valve ''down as far as it seemed like he could but there was still lots of steam escaping and I got on it with both hands and turned with all I had to turn it to get it shut off to where it didn't leak through.''

There was evidence also that the valve was wide open when the witness first started to turn it down.

There was evidence also that there was an absolutely safe method of preventing the escape of steam by screwing a cap on the end of the pipe, which concededly was not done on the pipe from which the radiator in question had been disconnected, though caps had been used on the pipes leading to radiators in the cafe and bar which had been disconnected.

The evidence shows that by removing the valve, a cap could have been placed on the end of the pipe coming from the furnace and by so doing the steam could have been shut off absolutely. The only reason given for not doing this was that it was unnecessary work.

Under the circumstances here shown the inferences to be drawn from the evidence as to whether defendants used reasonable care in preventing steam from escaping from the pipe, are open to different conclusions by reasonable men and hence the issue was properly submitted to the jury. Maki v. Murray Hospital, 91 Mont. 251, 7 Pac. (2d) 228; Puutio v. Roman, 76 Mont. 105, 245 Pac. 523; First National Bank of Lewistown v. Wilson, 57 Mont. 384, 188 Pac. 371.

The fact that there was evidence that closing the valves before disconnecting a radiator constituted standard

plumbing practice, where the disconnection was to be temporary is immaterial since the standard is "not what men ordinarily do under like circumstances, but what reasonably prudent and careful men, having regard for the rights and safety of others, do under like circumstances." Thompson on Negligence, Vol. 4, sec. 3770, quoted with approval in Kinsel v. North Butte Min. Co., 44 Mont. 445, 470, 120 Pac. 797, 805. "Custom never exonerates from the imputation of negligence." Conway v. Monidah Trust, 52 Mont. 244, 157 Pac. 178, 180; Surman v. Cruse, 57 Mont. 253, 187 Pac. 890. Likewise, it would be for the jury to say whether several days, as here, would constitute a temporary disconnection, particularly at a place frequented by the general public, as here.

It is contended that plaintiff's are bound by the testimony of Robertson because they offered his deposition in evidence.

Reliance is placed on R. C. M. 1947, sec. 93-1801-12. Even though we consider the deposition as evidence of plaintiffs, the result contended for does not follow.

Plaintiffs are not bound by the evidence in the sense that they may not offer evidence that conflicts with it and have all the evidence considered by the jury.

We declared the applicable rule in Hardie v. Peterson, 86 Mont. 150, 282 Pac. 494, 497, where we said: "The rule is well established that, if there is a conflict in the evidence arising from discrepancies between testimony of witnesses called for plaintiff, a nonsuit is improper if some of the evidence supports the plaintiff's case. [Citing many authorities including the case of Olds v. Hines, 95 Or. 580, 187 Pac. 586, 588, 188 Pac. 716.]" And continuing we said: "The rule was stated in the Olds Case, above, which is typical of that announced in the others, as follows: 'We remember also that it is a binding principle that the plaintiff is entitled to the benefit of whatever his testimony tends to prove, although his witnesses may contradict each other, and that, if any reasonable construction of the evidence on his behalf, or any part thereof, shall fairly tend to show that

he is entitled to recover, it is the duty of the court to submit the question to the jury.'

"Hence, if according to the credible testimony of any of plaintiff's witnesses, he has made out a cause of action, the case should have been submitted to the jury even though other witnesses for the plaintiff may have given a contrary version of the facts."

To the same effect are Federal Land Bank v. Green (Appelgren), 108 Mont. 56, 90 Pac. (2d) 489, and cases cited therein; Lake v. Webber, 120 Mont. 534, 188 Pac. (2d) 416; Gobel v. Rinio, 122 Mont. 235, 200 Pac. (2d) 700.

Defendants contend that the weather charts which showed cooler weather prior to September 7th and after the radiator was disconnected than existed on September 7th, corroborate the testimony of Robertson that he closed the valve and in effect conclusively show that the valve was closed because no steam escaped on those prior cooler days. This evidence does not establish the fact conclusively that the valve was closed on those prior days. Many factors make this evidence lacking in finality. The record, it is true, shows that the furnace was placed in operation several days before September 7th. The thermostat was placed inside the building in question in the second floor hallway. What the inside temperature of the building was on days previous to September 7th or whether it was cool enough on prior days to place the furnace in operation through the thermostatic control, the record does not reveal.

Likewise defendants contend that they did not know that the furnace was placed in operation prior to September 7th.

It is sufficient that they ought to have known that it was likely to be placed in operation at that season of the year since they were familiar with weather conditions in Montana.

Defendants next contend that the court erred in admitting Exhibits 18, 19, 20 and 21 in evidence over their objection.

These exhibits are all in the handwriting of Mr. Harrison, one of the counsel for plaintiffs. They contain figures taken from the books of account kept by plaintiffs from which computation

was made of the loss of profits to plaintiffs by reason of being unable to operate their business for a period of approximately two and one-half months after their stock was damaged and also computation was made of the curtailment of profits from November 15, 1950, to March 1, 1951, because of the impossibility of restocking their business with seasonable merchandise due to the interruption of their business. These elements of damages were specifically pleaded in the complaint.

R. C. M. 1947, sec. 93-401-12, subd. 5, provides: "There can be no evidence of the contents of a writing, other than the writing itself, except in the following cases: * * *

"5. When the original consists of numerous accounts or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

In State v. Ray, 88 Mont. 436, 445, 294 Pac. 368, 371, this court said: "The rule is that, where a fact can be ascertained only by examination of voluminous records, a competent witness who has perused the entire mass may state the net result of his examination. [Citing cases.]"

But this court went on further to state that: "The written report of the deputy examiner, under the circumstances here disclosed, was not admissible in evidence under any theory." But the circumstances disclosed in that case which made the written report inadmissible was the fact that it was based in part upon affidavits.

The use of memoranda containing computations made from records is proper. Stocking v. Charles Beard Co., 102 Mont. 65, 55 Pac. (2d) 949. This method of getting before the jury the result of the examination of books of account and records is to be commended.

IV Wigmore on Evidence, 3rd Ed., sec. 1230, page 434, states the rule as follows:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous detailed statements*—as, the net balance resulting from a year's vouch-

ers of a treasurer or a year's accounts in a bank ledger—it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.

"Most Courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available."

Here it should be noted that the books had been examined by a certified public accountant employed by defendants and if the data contained in the exhibits complained of were incorrect, defendants had the opportunity to so show, but no such effort was made. It is true that the public accountant testified that the percentage used by plaintiff in the exhibits was the wrong percentage in determining the gross profits. This resulted in a reduction in exhibit No. 20 from $3,266.92 to $2,388.93 and in exhibit No. 21 from $1,337.45 to $978.74 and the lesser figures are the ones accepted by the plaintiff thereafter in the trial.

No reversible error was committed by the court in admitting the exhibits in evidence.

By the pleadings as amended during the course of the trial, plaintiff's damages sought were these: Loss of merchandise, $11,-949.54; damage to furniture and fixtures, $250; loss of profits during the two and one-half months when the store was closed, $2,388.93; loss of profits during three and one-half months when business was reduced, $978.74, total, $15,567.21.

The verdict of the jury was for the full amount but without interest. On the issue of damages the court instructed the jury as follows:

"You are instructed that if your verdict in this case be for the plaintiff, that it will then become your duty to determine what, if any, damages the plaintiffs have suffered as the proximate result of the defendants' negligence, if any.

"If your verdict be for the plaintiffs, in assessing damages which the plaintiffs have suffered, if any, you shall take into consideration the reasonable wholesale market value at Malta, Montana, of the merchandise damaged, if the same was damaged, immediately before such damage, if any, less the reasonable market value at Malta, Montana, of the goods immediately after the damage, if any; the reasonable loss of profits the plaintiffs suffered, if any, and the reasonable cost, if any of refinishing of the plaintiffs' furniture and fixtures proximately resulting from the negligence, if any, of the defendants complained of and established by a preponderance of the evidence.

"You cannot allow the plaintiffs in excess of $15,567.21 together with interest at the rate of six percent per annum from the 1st day of March, 1951."

Defendants contend that there was no evidence in the record showing the wholesale market value at Malta, on September 7, 1950. Plaintiffs take the view that the wholesale cost to them is the same thing as the wholesale market value. Their proof of value consisted of the cost price to them. Defendants contend that this evidence is no proof of wholesale market value since plaintiffs themselves admitted that sometimes they have goods that are "marked-down to the point that the selling price is lower than the cost price."

Immediately after the damage was done, at the instance of defedants through Mr. Proctor and others, an inventory of the damaged goods was taken. It showed the cost price and the selling price. It was sent by registered mail to Mr. Proctor. No copy was retained by or in possession of plaintiffs.

Most of the goods in stock came in shortly before the damage was sustained. If there were any marked down items in the inventory defendants did not see fit to present it in the evidence. "The price paid for property is generally held to be strong, but

not conclusive, evidence of what the value of the property would have been if as represented." Doyle v. Union Bank & Trust Co., 102 Mont. 563, 59 Pac. (2d) 1171, 1173, 108 A. L. R. 1047, and see to the same effect, Silvast v. Asplund, 99 Mont. 152, 42 Pac. (2d) 452; Atlanta Baggage & Cab Co. v. Mizo, 4 Ga. App. 407, 61 S. E. 844; General Fire Extinguisher Co. v. Beal-Doyle Dry Goods Co., 110 Ark. 49, 160 S. W. 889; Angerman Co. v. Edgemon, 76 Utah 394, 290 Pac. 169, 79 A. L. R. 40.

In the absence of evidence tending to show that any items had a wholesale market value different from or less than the cost price, or what those items might consist of when all such information was in the possession of defendants and not in possession of plaintiffs, we cannot say that defendants suffered any prejudice by the giving of the instruction complained of.

Defendants contend that plaintiffs were not entitled to recover anticipated gross profits lost by reason of the interruption of their business. Their contention is that it is only net profits lost to plaintiff's that they are permitted to recover.

Plaintiffs take the view and properly so, that gross profits and net profits in this case are the same because the proof shows that plaintiffs' expenses were substantially the same regardless of the amount of business done. Employees' wages, advertising after the business was resumed, rent, lights and heat were shown by the evidence to be constant or practically so. The fact that there may have been some slight variation in the expenses is immaterial. The law does not require that loss of profits be shown with precise accuracy. It is sufficient if the proof shows the basis for a reasonable estimate. Falstaff Brewing Co., v. Iowa Fruit & Produce Co., 8 Cir., 112 F. (2d) 101; Natural Soda Products Co. v. City of Los Angeles, 23 Cal. (2d) 193, 143 Pac. (2d) 12. There is ample basis in the record for the award made by the jury.

Finding no reversible error in the record the judgment is affirmed.

Mr. CHIEF JUSTICE ADAIR, and MR. JUSTICES BOT-TOMLY and ANDERSON, concur.

Mr. Justice Davis, not being a member of the court at the time of oral argument, took no part in the decision.